# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## ON REMAND

## NO. 03-03-00374-CV

**Jan Lubin, Gilberto Villanueva, Michael Paladino, Gerald Hooks, and Lesley K. Hooks, Appellants**

**v.**

**Farmers Group, Inc.; Farmers Underwriters Association; Fire Underwriters Association; Farmers Insurance Exchange; Fire Insurance Exchange; Texas Farmers Insurance Company; Mid-Century Insurance Company of Texas; Mid-Century Insurance Company; Truck Insurance Exchange; Truck Underwriters Association; Farmers Texas County Mutual Insurance Company; The State of Texas; Texas Department of Insurance; and Texas Commissioner of Insurance, Appellees**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 261ST JUDICIAL DISTRICT NO. GV202501, HONORABLE SCOTT H. JENKINS, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

The issue in this interlocutory appeal is whether the class action filed by the attorney general in this case was properly certified. Under former article 21.21, section 17 of the insurance code, the Department of Insurance (the "Department") may ask the attorney general to institute a class-action lawsuit to recover from an insurer damages for injuries done to the insurance-buying public. *See* former Tex. Ins. Code art. 21.21, § 17.[1] The district court concluded that the class could

_____

[1] At the time of certification, the relevant insurance provisions at issue in this case were found in former articles 21.21, 21.21-6, and 21.21-8 of the insurance code. *See* Act of April 25, 1957, 55th Leg., R.S., ch. 198, 1957 Tex. Gen. Laws 401, 401, *amended by* Act of

be certified because all of the statutory prerequisites for certification listed in the former provisions

of the insurance code had been satisfied.  On appeal, we originally concluded that the requirements

had not been complied with because, among other reasons, there were no class representatives

participating in the class action.  Accordingly, we reversed the district court's certification order.

*Lubin v. Farmers Group, Inc.*, 157 S.W.3d 113 (Tex. App.—Austin 2005, pet. granted) ("*Lubin I*").

The case was appealed, and the supreme court determined that it was not necessary to recruit one or

more class representatives in class actions pursued by the attorney general at the request of the

Department.  After reaching that conclusion, the supreme court remanded the case back to this Court

so that we could address whether, in light of the supreme court's determination, the requirements

for class certification had been met and to consider the parties' other issues that were not addressed

in our first opinion.  *Farmers Group, Inc. v. Lubin*, 222 S.W.3d 417, 427-28 (Tex. 2007) ("*Lubin

II*").  On remand, we will affirm the order of the district court.

## STATUTORY FRAMEWORK

Because it provides necessary context to the issues involved in this case, we briefly

summarize the statutory provisions at issue in this case.  This case involves a class-action lawsuit

---

May 10, 1973, 63rd Leg., R.S., ch. 143, § 2, 1973 Tex. Gen. Laws 322, 335 ("former Tex. Ins. Code art. 21.21"); Act of May 29, 1995, 74th Leg., R.S., ch. 415, § 1, 1995 Tex. Gen. Laws 3005, 3005 ("former Tex. Ins. Code art. 21.21-6"); Act of May 17, 1995, 74th Leg., R.S., ch. 414, § 16, 1995 Tex. Gen. Laws 2988, 3002 ("former Tex. Ins. Code art. 21.21-8").  After the class was certified, the legislature repealed those insurance code provisions and enacted new provisions incorporating the content of the repealed provisions.  *See* Act of May 20, 2003, 78th Leg., R.S., ch. 1274, §§ 2, 26(a)(1), 26(a)(10), 2003 Tex. Gen. Laws 3611, 3641, 4138; *see also* Tex. Ins. Code Ann. §§ 541.001-.454 (replacing former article 21.21), 544.001-.204 (replacing former article 21.21-6), 544.051-.054 (replacing former article 21.21-8) (West 2009).  Because some of the language in the new provisions differs from the language in the former articles and because many of the arguments made in the parties' briefs are tied to the language found in the former articles, we will generally refer to the former insurance code provisions.

2

filed under former provisions of the insurance code. Class actions are procedural mechanisms used "to increase judicial economy and efficiency for suits with parties too numerous for conventional joinder." *Citizens Ins. Co. of Am. v. Daccach*, 217 S.W.3d 430, 449 (Tex. 2007); *see General Motors Corp. v. Bloyed*, 916 S.W.2d 949, 952 (Tex. 1996) (explaining that class actions are designed to allow numerous claimants with common complaints to obtain relief when it is not feasible for claimants to obtain relief through multiple suits for damages). Moreover, they are "intended to eliminate or reduce the threat of repetitive litigation, prevent inconsistent resolution of similar cases, and provide an effective means of redress for individuals whose claims are too small to make it economically viable to pursue them in independent actions." *Daccach*, 217 S.W.3d at 449-50; *see also id.* at 450 (stating that "class actions provide no greater substantive rights than other procedural mechanisms of litigation").

Former provisions of the insurance code authorized the filing of class actions when a member "of the insurance buying public has been damaged by an unlawful method, act, or practice." Former Tex. Ins. Code art. 21.21, § 17. Further, the code allowed a class action to be filed by two distinct parties: "the individual damaged" or the attorney general at the request of the Department. *Id.*

The former insurance code provisions also stated that to maintain a class action under the insurance code, the following four prerequisites necessary for typical class actions must be met: numerosity, commonality, typicality, and adequacy of protection. *Id.* § 18; *see Bloyed*, 916 S.W.2d at 953-55 (explaining that prerequisites are designed to protect absent class members and ensure

3

that actions taken on their behalf actually serve their interests).  In particular, the code provided as follows:

> The court shall permit one or more members of a class to sue or be sued as representative parties on behalf of the class only if:
>
> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Former Tex. Ins. Code art. 21.21, § 18(a).

In addition to these prerequisites, the former insurance code provisions specified that a class "action may be maintained" only if at least one of three other additional requirements was also satisfied.  *Id.* § 18(b).  The condition relevant to this case (predominance) provided that a class action can be certified if the four prerequisites listed above are met and if "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."  *Id.* § 18(b)(3) (also listing factors for court to consider when deciding whether predominance requirement was met).[2]

---

[2]  These same requirements are listed in rule 42 of the rules of civil procedure.  *See* Tex. R. Civ. P. 42(a), (b).  For ease of reading and because the requirements are the same, we will generally refer only to the former insurance code provisions.

**BACKGROUND**

In late 2001, Farmers[3] stopped offering HO-B (all-risk) homeowners policies and began offering HO-A (stated-peril) homeowners policies. The new policies limited coverage for water damage and eliminated mold coverage. Various policyholders complained that the new policies offered reduced coverage at unfair rates.

After receiving these complaints, the Department investigated and discovered that even with the reduced coverage, Farmers' premiums had in fact increased. *See* Tex. Ins. Code Ann. §§ 401.051, .052, .054 (West 2009) (authorizing Department to investigate insurers' records on recurring basis). In late 2001, the attorney general opened his own investigation into Farmers' practices, and the Department referred its investigation to the attorney general. As part of his inquiry, the attorney general sent Farmers various civil investigative demands, requesting information about Farmers' business practices. *See* Tex. Bus. & Com. Code Ann. § 17.61 (West Supp. 2008) (explaining that if attorney general believes that individual is in possession of information relevant to investigation of violation of Deceptive Trade Practices Act, he may demand that individual produce documents and allow inspection of documents). After finishing his

---

[3] There are two sets of appellees in this case. The first set is composed of the following eleven related or associated insurance providers: Farmers Group, Inc., Farmers Underwriters Association, Fire Underwriters Association, Farmers Insurance Exchange, Fire Insurance Exchange, Texas Farmers Insurance Company, Mid-Century Insurance Company of Texas, Mid-Century Insurance Company, Truck Insurance Exchange, Truck Underwriters Association, and Farmers Texas County Mutual Insurance Company. We will refer to that set of appellees collectively as "Farmers." The second set is composed of the State, the Department, and the Commissioner of Insurance. When discussing this set of appellees jointly, we will generally refer to them as the attorney general.

investigation, in August 2002, the attorney general sued Farmers.[4] The suit alleged that Farmers had engaged in various improper and discriminatory actions.

First, the attorney general alleged that despite the fact that the new HO-A policies Farmers was offering provided less coverage than its former HO-B policies, Farmers was charging more for the HO-A policies than it had for its HO-B policies.

Second, the attorney general argued that some of the factors used to determine a policyholder's premium (e.g., credit history and age of a home) resulted in over- and undercharges. For example, the attorney general argued that Farmers was improperly using policyholders' credit histories when calculating premiums. Specifically, he alleged that after Farmers obtained a policyholder's credit history, it would assign the policyholder to a risk-assessment category in order to determine the policyholder's premium.[5] Further, the attorney general asserted that Farmers did not inform its policyholders regarding its decision to use their credit histories when making premium determinations or the manner in which their credit histories affected their premiums. In other words, the attorney general argued that Farmers was not notifying or was inadequately notifying its policyholders that their premiums were being increased due to their credit information. Moreover,

---

[4] Originally, the suit was brought not as a class action but "in the name of the State of Texas and on behalf of the Texas Commissioner of Insurance" against Farmers for "deceptive, misleading, and discriminatory homeowners-insurance practices" in violation of the insurance code and the Deceptive Trade Practices Act. *See* Tex. Bus. & Com. Code Ann. §§ 17.41-.63 (West 2002 & Supp. 2008) ("Deceptive Trade Practices-Consumer Protection Act").

[5] As will be discussed later, Farmers also assigned its automobile policyholders to risk-assessment categories based, in part, on their credit histories when determining automobile insurance premiums.

the attorney general contended that Farmers' use of the credit histories was inconsistent, resulting in individuals with similar loss histories paying significantly different premiums.

In addition to challenging the use of credit information, the attorney general also criticized the discounts Farmers gave based on the age of a policyholder's home. Essentially, Farmers was using the age of a policyholder's home to assess the probability of a claim being made, but the attorney general contended that the discounts calculated were not consistent with the actual loss histories for homes.

In a related assertion, the attorney general argued that in addition to improperly using various factors when determining its HO-A premium rates, Farmers' premium calculations failed to take into account the geographical location of its policyholders' homes. Specifically, the attorney general contended that although the new HO-A policies limited the coverage for water damage and eliminated mold coverage, the reduction in coverage affected policyholders differently depending on whether they lived in regions that were likely or unlikely to have water or mold claims. Further, the attorney general contended that rather than tailoring HO-A premiums to reflect those differences, Farmers simply applied a uniform multiplier to calculate the change in the cost of the new policies.

Third, the attorney general objected to various fees that Farmers was charging. Farmers was providing insurance through a reciprocal exchange in which the participating insurance companies spread the risk of loss among themselves. Farmers Group, Inc. was operating the exchange, and for this service, it charged management fees. The amount of the fee was based upon the amount of premiums collected by the insurance companies. In light of this exchange system, the attorney general argued that Farmers failed to satisfy its fiduciary duties to its policyholders by failing to notify them:

7

(a) [of its] decision to enter into a management-fee agreement based on percentage of premium collected [in a manner that] benefits Farmers . . . to the detriment of the Exchanges and the policyholders; (b) what the terms of the management-fee agreement actually are; (c) any possible adverse impact on premiums the management fee creates; and (d) that Farmers . . . is in fact making more money through management fees as premiums increase.

Finally, some time after beginning his initial investigation into Farmers' practices concerning home insurance policies, the attorney general also challenged Farmers' decision to use policyholders' credit histories when determining premiums for its automobile policies. Similar to the complaints regarding home policies, the attorney general asserted that Farmers assigned automobile policyholders to risk-assessment groups based on their credit histories but did not disclose the effect that a policyholder's credit history had on the premium that the policyholder was ultimately charged for automobile coverage.[6] In other words, the attorney general alleged that Farmers was not disclosing or was inadequately disclosing when a policyholder's credit history resulted in higher premiums. As a result of this allegation, several new insurers were added to the suit.

Around the time that the attorney general filed suit, the Department initiated an administrative proceeding against Farmers, and the Commissioner of Insurance ("Commissioner") issued a cease-and-desist order against Farmers, requiring Farmers to quickly change its rating practices. Contemporaneously, Farmers informed its policyholders that it would not be renewing

---

[6] Jeff Boyd, an employee for the attorney general's office, explained that the attorney general challenged Farmers' automobile insurance practices after he discovered that Farmers was misusing its automobile policyholders' credit information in the same manner that it had misused its homeowners policyholders' credit information.

8

its homeowners insurance policies and told its agents that it would not be accepting any new business in Texas.

Shortly thereafter, the attorney general, the Department, and Farmers all participated in various negotiations regarding the claims made by the attorney general and Farmers' decision to leave the Texas market. On November 30, 2002, the attorney general entered into a Memorandum of Understanding ("Memorandum")[7] with Farmers, settling the Department's administrative proceeding and the attorney general's investigation and suit and setting forth the terms of a proposed "global settlement." As part of the proposed settlement, the attorney general agreed to amend his pleadings in order to change the suit into a settlement class action.

The Memorandum specified that the "intent and spirit" of the proposed settlement agreement was to "terminate all of the disputes" and to permit Farmers "to continue to provide insurance in the Texas market." In other words, the proposed agreement was a universal release in which the class members agreed to release Farmers from "all existing, known and unknown claims, demands or causes of action . . . whether pending or threatened, suspected or unsuspected, contingent or non-contingent, for all existing, known and unknown damages and remedies that arise out of or relate to the acts and/or occurrences alleged in the" lawsuit regarding homeowners insurance. Effectively, the agreement released Farmers from all claims resulting from excessive premiums charged and from Farmers' decision to no longer provide HO-B policies and to substitute HO-A policies for the HO-B policies. The release regarding automobile insurance claims was more limited

---

[7] The Memorandum was amended several times and was amended after the certification hearing to address some concerns expressed by the district court during the hearing. In this opinion, we will refer to the contents of the most recent agreement.

and only released claims relating to "the disclosure or nondisclosure of consumer credit information or the disclosure or nondisclosure of the use or effect of using consumer credit information."

Under the Memorandum, Farmers was required to make various reductions to the premiums it charges and to set up a fund to compensate the class members. First, Farmers agreed to immediately reduce its homeowners insurance base-premium rates by 6.8% and to refrain from increasing those rates for a specified period of time. The reduction was to be applied prospectively to any existing HO-A policy that was renewed or to any new policy issued. In addition, under the agreement, the reduction was also to be applied retrospectively to HO-A policies issued before the date the Memorandum was agreed to. In other words, individuals who had purchased an HO-A policy before the agreement was proposed were entitled to relief in the form of a refund. For individuals still covered by an HO-A policy, the refund will be given as a credit. For individuals who no longer have policies with Farmers, the refund will be given by check. Because the prospective and retrospective relief was tied to the allegedly high homeowners-insurance-premium rates that Farmers began charging after it stopped offering its HO-B policies, recovery was limited to those individuals who had purchased an HO-A policy before or after the agreement was proposed: individuals who did not purchase an HO-A policy after their HO-B policies were discontinued will not receive either type of recovery.

Second, in addition to these general reductions, Farmers also agreed to give additional reductions to qualifying policyholders. As mentioned previously, the attorney general objected to the manner in which Farmers used certain information to determine its policyholders' premiums both before and after Farmers discontinued its HO-B policies. For example, the attorney general alleged

10

that Farmers was using its policyholders' credit histories and the ages of their homes in a manner that led to inconsistent premium rates. Further, the attorney general objected to Farmers' decision to not adjust its premium rates to account for the differences in the risk of loss resulting from the geographical locations of its policyholders' homes. As part of the proposed settlement, Farmers developed new methods for determining premium adjustments based on the credit histories of its policyholders, the ages of their homes, and the geographical locations of their homes. Those new methods were submitted to the Department for approval to ensure that the new methods accurately reflected true insurability differences.

Under the new methodology, various policyholders would be entitled to discounts to their premiums. As with the flat-rate-premium reduction, Farmers agreed to apply the individual discounts prospectively and retrospectively. Regarding retrospective recovery, if policyholders paid premiums that exceeded what they would have been required to pay had Farmers employed the agreed discounts at the time the policies were issued, they were entitled to a complete (100%) refund of that difference. However, if a policyholder paid less under the old system than he would have had the new standards been in effect at the time his policy went into effect, the policyholder was obviously not entitled to a refund but also was not required to pay for the benefit that he had previously received. Individuals who had purchased insurance policies within a few years of the effective date of the Memorandum were entitled to recover. Because the recovery period included years in which HO-B policies were still being issued, relief was not strictly limited to individuals who had purchased HO-A policies, meaning that recovery for overcharges extended to HO-B policyholders who were insured during the recovery period listed in the agreement even if they had

11

never purchased HO-A policies. Those individuals still insured under an HO-A policy will be given a credit towards their premiums, and the other individuals entitled to relief will receive the refund via a check from Farmers.

Finally, under the proposed settlement, Farmers agreed to reimburse individuals who were charged higher premiums due to mistakes in their credit reports. In particular, Farmers agreed to reimburse policyholders for "any overcharges that may have occurred to homeowners or automobile insurance policyholders . . . who paid a premium . . . that would have been less, but for erroneous credit information." In other words, the policyholders were entitled to completely recover the difference between what they paid and what they would have paid had Farmers used their correct credit information when calculating premiums. As with the individualized discounts, the credit refund applied to policies in effect before and after Farmers discontinued its HO-B policies, meaning that HO-B policyholders were also entitled to recovery. Unlike the other types of recovery listed above, this relief was available to automobile insurance policyholders as well as homeowners insurance policyholders.

In light of the preceding, the Memorandum established the following settlement classes: the "Rate Class," the "Discount Class," and the "Credit Usage Notice Class." The Rate Class was composed of all of the policyholders who were informed that their HO-B policies would not be renewed: that group included all of the individuals entitled to the prospective or retrospective HO-A premium-rate reductions. The Discount Class consisted of all of the homeowners insurance policyholders who were eligible to receive the individual discounts or refunds discussed previously. Finally, the Credit Usage Notice Class comprised the homeowners or automobile insurance

12

policyholders who were entitled to receive a refund due to Farmers' use of erroneous credit information.[8] Under these classifications, an individual policyholder may be a member of more than one subclass and, therefore, be entitled to more than one type of recovery.

In addition to listing these components of the settlement, the Memorandum stated that it "is not feasible to calculate in advance the amount, if any, to be paid to each class member" because the amounts "require individualized calculations." For the most part, the recovery will depend on an examination of Farmers' records. Although the exact value of the settlement was not established, the Memorandum provided an estimate for the value of the settlement as $117,500,000. Notably, as discussed previously, Farmers agreed to pay or credit "100% of any premium differential resulting from the" individualized discount calculations and the credit refunds. In other words,

---

[8] The Memorandum defined "Settlement Classes" as follows:

(1) all of [Farmers'] Texas homeowners insurance policyholders (a) whose homeowners insurance policies incepted (including renewals) from December 28, 2001, through and including December 27, 2002, or (b) who received a notice at any time after November 14, 2001, that their HO-B policy would not be renewed (the "Rate Class"); (2) all of [Farmers'] homeowners insurance policyholders who according to Farmers records were eligible to receive discounts for [Farmers Property Risk Assessment], age of home, or territory from November 16, 2000, through and including December 10, 2002 (the "Discount Class"); and (3) all Texas homeowners or automobile insurance policyholders of [Farmers] who according to Farmers records were provided or should have been provided a Credit Usage Notice from October 1, 1999, through February 28, 2003 (the "Credit Usage Notice Class").

The Memorandum also defined "credit usage notice" as "notice of adverse action under the Fair Credit Reporting Act." It is worth noting that Farmers also agreed to revise their credit-scoring notices, which are supposed to be sent to policyholders when their premiums increased due to their credit histories.

Farmers agreed to provide whatever funds were necessary to ensure that policyholders obtained the full benefit of the individualized discounts and the credit refunds.

Under the terms of the agreement, $2 million will be given to the State for attorneys' fees and costs to the State, and the Memorandum stated that members of any of the subclasses described above may elect to opt out of the class action by submitting "a timely written request for exclusion." Moreover, the Memorandum specified that if more than two percent of the policyholders chose to opt out of the class action, Farmers or the attorney general may terminate the settlement class action.

In December 2002, as required by the Memorandum, the attorney general filed an amended petition that added a class-action component. The amended petition added the automobile insurance claims described earlier and additional insurance companies and stated that it was filed "in the name of the State of Texas . . . and on behalf of the Commissioner . . ., the Department . . ., and certain classes of Texas homeowners and automobile insureds."[9] Further, the petition stated, "At the request of the Commissioner and in the public interest, the State, by and through the Attorney General, brings these claims as a class action . . . on behalf of the Settlement Classes." Additionally, the petition incorporated the definitions for the Rate Class, the Discount Class, and the Credit Usage Notice Class listed in the Memorandum and described previously. The petition also alleged that the "prerequisites to maintaining a class action" had been met.[10] In addition to the

---

[9] The attorney general later filed a second amended petition making the same substantive allegations.

[10] Alternatively, in his petition, the attorney general alleged that this class action was also proper under the doctrine of *parens patriae*. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel.*

petition, the attorney general filed the Memorandum as a proposed settlement agreement, a motion for settlement class certification, and a proposed notice to be sent to the class members.

Shortly before the attorney general filed his amended pleading, various policyholders objected and intervened in the case. Those policyholders were Jan Lubin, Gilberto Villanueva, Michael Paladino, Gerald Hooks, and Lesley K. Hooks (cumulatively the "Policyholders"). Although all five of the Policyholders intervened, they did so in groups and have divided themselves into two groups for the purpose of appeal. Jan Lubin, Gilberto Villanueva, and Michael Paladino constitute the first group, and Gerald Hooks and Lesley K. Hooks comprise the other group. When necessary to refer to issues raised solely by one of the groups, we will refer to the first group as "Lubin" and to the second group as "the Hookses."

---

*Barez*, 458 U.S. 592, 601-02 (1982) (explaining doctrine of *parens patriae* as ability of state to pursue claims affecting well-being of its populace). In particular, the attorney general alleged that by drafting the various insurance code provisions at issue, the legislature provided a "classic grant of statutory *parens patriae* authority to the Attorney General to protect the interests of Texas insureds." For this reason, the attorney general asserted that it was unnecessary for him to comply with all of the class-action requirements listed in the insurance code and in the rules of civil procedure.

In its order, the district court made two alternative determinations. First, it concluded that the attorney general could "fulfill the role of the Settlement Classes' Counsel" by virtue of the *parens patriae* doctrine. Alternatively, it concluded that even if the attorney general had to comply with all of the various prerequisites listed in the insurance code, those requirements had been met.

In our first opinion, we concluded that the former insurance code provisions did not bestow *parens patriae* authority on the attorney general. *Lubin I*, 157 S.W.3d at 122-23. The supreme court affirmed that determination and declined "to import [the doctrine] into the Insurance Code." *Lubin II*, 222 S.W.3d at 423-24. Accordingly, on remand, we need not revisit the arguments pertaining to that doctrine.

15

Villanueva and Paladino had previously filed their own class actions against several of the companies that are appellees in this case.[11] The Hookses were members of another class-action suit filed by Sandra Geter. That suit was filed on behalf of the individuals whose HO-B policies had been nonrenewed by Farmers. For that reason, the class in the Geter class action was composed of the same individuals that make up the Rate Class at issue in this case.

The district court conducted a lengthy hearing on the class-certification issue and heard testimony from several witnesses. *See* former Tex. Ins. Code art. 21.21, § 18(g) (requiring court approval before class action may be settled). In June 2003, the court signed an "Order of Preliminary Approval," finding that the attorney general could bring the class action.[12] The court found that the numerosity, typicality, commonality, and adequacy prerequisites had been met, that the common questions of law and fact were predominant, and that pursuing the claims in

---

[11] Villanueva filed his class action in 2000 and asserted that various companies had engaged in discriminatory practices regarding its automobile insurance policies. *See* former Tex. Ins. Code art. 21.21-8 (prohibiting insurers from unfairly discriminating "between individuals of the same class and of essentially the same hazard"). Essentially, Villanueva asserted that the insurance companies were improperly using their policyholders' credit information when determining premiums, which resulted in policyholders paying excessive premiums. Paladino filed his class action in 2002. In that case, Paladino made allegations that were similar to the ones made by Villanueva.

[12] It is worth noting that during the certification hearing, Lubin argued that the proposed settlement was the result of collusion between Farmers, the attorney general, and other State officials. In its order, the district court found "that there has been no collusion between the State and [Farmers] with respect to negotiating the" proposed settlement. None of the Policyholders have appealed that determination.

this case through a class-action format was superior to other available methods.[13] Accordingly, the court preliminarily approved the settlement.[14]

The Policyholders brought this interlocutory appeal. *See* Tex. Ins. Code Ann. § 541.259 (West 2009) (authorizing interlocutory appeals of certification orders). On appeal, among other claims, the Policyholders asserted that the class action did not satisfy all of the necessary prerequisites. The attorney general disagreed. Essentially, he argued that the former provisions of the insurance code set up two types of class actions: ones filed by the attorney general and ones filed by injured parties. *See* former Tex. Ins. Code art. 21.21, § 17. Further, he contended that class actions filed by the attorney general do not have to strictly comply with all of the statutory prerequisites. *Id.* § 18 (listing prerequisites for filing class action).

---

[13] In particular, the court determined as follows:

[E]ach of those requirements has been met, specifically: (a) each of the Settlement Classes is so numerous that joinder of all members is impracticable; (b) there are questions of law or fact common to the Settlement Classes which predominate over any individual questions; (c) the claims or defenses brought by the State on behalf of Farmers' policyholders are typical of the claims or defenses of the Settlement Classes and the State is authorized to bring claims on behalf of the Settlement Classes; (d) in negotiating and entering into the Settlement Agreement, the State has fairly and adequately represented and protected the interests of the Settlement Classes; (e) the questions of law or fact common to the Settlement Classes predominate over any questions affecting only individual members; and (f) certifying this Action as a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

[14] During the hearing, Professor Samuel Issacharoff testified as an expert on class actions, and the district court explained that it relied heavily on his testimony when making its decision. For that reason, we will refer to his testimony with some frequency in this opinion.

This Court disagreed with the attorney general's assertions and concluded that he must comply with all of the prerequisites in order to maintain a class action. *Lubin I*, 157 S.W.3d at 127. Further, we determined that the attorney general had "not shown that the State has suffered an injury similar to those suffered by the class members and thus has not shown that he may act as the class representative himself." *Id.* Moreover, we concluded that because the attorney general cannot act as a class representative and because the attorney general had failed to appoint a class representative, some of the necessary prerequisites for class certification (e.g., typicality and adequacy) were not satisfied. *Id.* at 129.

The attorney general appealed our determination to the supreme court. Although the supreme court agreed that the attorney general had to comply with the prerequisites for class certification, it also determined that for class actions brought by the attorney general, the class-action requirements "must be applied generally to the claims asserted by the" attorney general, rather than to the attorney general himself. *Lubin II*, 222 S.W.3d at 420. In making this determination, the supreme court noted that the insurance code "appears to authorize attorneys general to file suit in their own right, rather than merely acting as counsel for private citizens." *Id.* at 424. Accordingly, the supreme court concluded that it was not necessary for the attorney general to "recruit one or more policyholders as representatives." *Id.*

To the contrary, the supreme court noted that the attorney general's duty is to "represent the state" and that requiring him to recruit individual representatives "would inevitably restrict the 'broad discretionary power' attorneys general need to carry out their constitutional duties." *Id.* at 425 (quoting *Terrazas v. Ramirez*, 829 S.W.2d 712, 721 (Tex. 1991)). In other words,

the supreme court determined that the absence of a class representative in these types of cases will not, on its own, prohibit the class actions from being certified.

After concluding that the insurance code authorized the attorney general to file a class action in his "own right," the supreme court then remanded the case to this Court to address whether the requirements for class certification were met in light of the supreme court's new directive and to address the other issues raised but not addressed in our prior opinion. *Id.* at 427-28.

## STANDARD OF REVIEW

A trial court must conduct a rigorous analysis before ruling on a class certification in order to ensure that the prerequisites have been met. *Compaq Computer Corp. v. Lapray*, 135 S.W.3d 657, 663 (Tex. 2004); *see also McAllen Med. Ctr., Inc. v. Cortez*, 66 S.W.3d 227, 232 (Tex. 2001) (explaining that courts have rejected concept that they are to certify first and determine compliance later). In addition, courts use heightened scrutiny when reviewing settlement class actions. *McAllen Med. Ctr., Inc.*, 66 S.W.3d at 232. This heightened scrutiny is employed in order to "protect absent class members" from the possibility that their claims may be settled in a manner that is inconsistent with their best interests. *Id.* at 232-33; *see Bloyed*, 916 S.W.2d at 953-54.[15] The

---

[15] Although we apply heightened scrutiny in this case, we note that many of the justifications requiring heightened scrutiny in traditional settlement class actions would not seem to be present in a class action pursued by the attorney general. For example, the supreme court has stated that settlement class actions provide a greater opportunity for attorneys to pursue their own interests at the expense of the class and to obtain large legal fees but settle the class claims for small amounts. *General Motors Corp. v. Bloyed*, 916 S.W.2d 949, 953-54 (Tex. 1996) (citing Jonathan R. Macey & Geoffrey P. Miller, *The Plaintiffs' Attorney's Role in Class Action and Derivative Litigation*, 58 U. Chi. L. Rev. 1, 7-8 n.4 (1991) *and* Richard A. Posner, *An Economic Analysis of Law* 570 (4th ed. 1992)). Similarly, the supreme court has explained that in settlement class actions there is a greater potential for class representatives and counsel "to ignore differences among class members, or even

19

elevated review is applied to the following class-action requirements: typicality, adequacy, and predominance. *McAllen Med. Ctr., Inc.*, 66 S.W.3d at 232-33.

We review a trial court's preliminary order to certify a class for an abuse of discretion. *Southwestern Ref. Co. v. Bernal*, 22 S.W.3d 425, 433 (Tex. 2000); *see Bloyed*, 916 S.W.2d at 955; *see also Farmers Ins. Exch. v. Leonard*, 125 S.W.3d 55, 60 (Tex. App.—Austin 2003, pet. denied) (explaining that trial courts are given broad discretion when determining whether to certify class). A trial court abuses its discretion when ruling on a class certification if it does not properly apply the law to the undisputed facts, if it acts unreasonably or arbitrarily, or if it rules "upon factual assertions not supported by the record." *State Indus., Inc. v. Fain*, 38 S.W.3d 167, 169 (Tex. App.—Waco 2000, pet. denied). Although certifications are reviewed for an abuse of discretion, not every presumption will be made in favor of the trial court's ruling. *Henry Schein, Inc. v. Stromboe*, 102 S.W.3d 675, 691 (Tex. 2002). Compliance with the class-certification requirements must be demonstrated and not presumed, but appellate courts should give the benefit of the doubt to the trial court's determinations regarding credibility of witnesses and other similar issues. *Id.*; *see Lapray*, 135 S.W.3d at 671.

---

collude with defendants at absent class members' expense." *McAllen Med. Ctr., Inc. v. Cortez*, 66 S.W.3d 227, 233 (Tex. 2001).

The lack of a specific class representative, the attorney general's role as an elected official answerable to the public, and his inability to seek personal monetary compensation for his representation in a class action would seem to foreclose the potential conflicts identified by the supreme court. Moreover, although the settlement in this case does authorize an award for attorney's fees, that award was less than two percent of the estimated value of the award and will be paid to the State, not the attorney general himself.

## DISCUSSION: LUBIN'S CLAIMS

On appeal, two sets of policyholders, Lubin and the Hookses, contest the propriety of the district court's decision to approve the certification in this case. We will address Lubin's claims first and then turn to the Hookses' assertions. First, Lubin argues that the district court abused its discretion by certifying the class action because the requirements of the insurance code were not met. In addition, Lubin contends that the former insurance code provisions do not empower the attorney general to pursue the types of claims forming the foundation of this class action. We will address those issues in the order listed.

### Class Action Requirements

As mentioned previously, the district court concluded that the four prerequisites to class certification (numerosity, commonality, typicality, and adequacy) were satisfied and further concluded that one of the additional necessary statutory elements was also satisfied. *See* former Tex. Ins. Code art. 21.21 § 18. Specifically, regarding the additional element, the court determined that "the questions of law or fact common to the Settlement Classes predominate over any questions affecting only individual members" and that "certifying this Action as a class action is superior to other available methods for the fair and efficient adjudication of the controversy." The Policyholders contend that the district court abused its discretion by concluding that the five elements had been met. In light of the supreme court's directive, we must determine whether the claims asserted generally satisfy the class-action requirements.

In resolving the issues presented on appeal, we must keep in mind that what is being reviewed in this case is the district court's decision to certify the class. The district court's decision

to preliminarily approve the settlement as part of the certification process "has no binding force." *McAllen Med. Ctr., Inc.*, 66 S.W.3d at 234. In other words, the preliminary certification of a settlement class action simply means that the class action may proceed, and the certification does not address the fairness or adequacy of a proposed settlement. *Cf. Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974) (explaining that certification component of class action concerns whether requirements for class action have been satisfied, not merits of claims presented); *see also* Tex. Ins. Code Ann. § 541.257(c) (West 2009) (instructing courts to use federal decisions for guidance in construing class-action provisions of insurance code). In fact, the settlement does not obtain a legal effect until the final approval in a fairness hearing. *McAllen Med. Ctr., Inc.*, 66 S.W.3d at 234. It is during a fairness hearing that district courts must thoroughly examine the terms of the settlement in order to see if the settlement is fair. *Id.*; *see* Tex. R. Civ. P. 42(e) (allowing court to approve settlement that binds class members "only after a hearing and on finding that the settlement . . . is fair, reasonable, and adequate").

*Numerosity*

The numerosity requirement is not disputed. Both the Policyholders and Farmers acknowledge that the proposed settlement will apply to hundreds of thousands, if not millions, of individuals who either have or used to have insurance coverage through Farmers. Accordingly, we cannot conclude that the district court abused its discretion by determining that the numerosity requirement had been met.

22

*Commonality*

The commonality requirement is also not highly disputed. Moreover, the threshold for satisfying the commonality requirement is not high. *Graebel/Houston Movers, Inc. v. Chastain*, 26 S.W.3d 24, 33 (Tex. App.—Houston [1st Dist.] 2000, pet. dism'd w.o.j.). In order to satisfy the commonality requirement, it is not necessary that all or even most of the questions of law or fact be common to the class. *Employers Cas. Co. v. Texas Ass'n of Sch. Bds. Workers' Comp. Self Ins. Fund*, 886 S.W.2d 470, 474 (Tex. App.—Austin 1994, writ dism'd w.o.j.). Rather, all that is required is that there be questions of law or fact common to the class. Tex. R. Civ. P. 42(a)(2); *see also E & V Slack, Inc. v. Shell Oil Co.*, 969 S.W.2d 565, 569 (Tex. App.—Austin 1998, no pet.) (explaining that questions are common to class if answer to one class member is answer to all class members).

As described earlier, there are three proposed subclasses involved in this class action. The Rate Class members share the common issue of whether Farmers was charging HO-A policyholders premium rates that were too high for the coverage provided through their policies. Similarly, the Discount Class members share the issue of whether the manner in which Farmers determined premiums led to inequitable and discriminatory results. Specifically, the class members share the issues of whether Farmers was using its policyholders' credit information and the age of their homes in a discriminatory manner and whether Farmers' decision to apply a standard-rate reduction to its HO-A policy premiums was improper. Finally, the Credit Usage Notice Class members share the common issue of whether Farmers was properly informing its policyholders when they were charged higher premiums due to their credit histories.

In light of the preceding, we cannot conclude that the district court abused its discretion by determining that there were common issues shared by the members of the subclasses.

*Typicality and Adequacy*

In her briefs, Lubin lists several sets of arguments for why she believes the adequacy element has not been satisfied and then generally asserts that the typicality element is not satisfied for the same reasons discussed in the "adequacy" portion of her briefs. *See Bloyed*, 916 S.W.2d at 953 (explaining that due process requires "adequate representation of the interests of absentee class members" because class actions are binding on all class members). For this reason and because the typicality and adequacy elements are closely related, we will address the two elements together.[16] *See Forsyth v. Lake LBJ Inv. Corp.*, 903 S.W.2d 146, 150 n.6 (Tex. App.—Austin 1995, writ dism'd w.o.j.) (consolidating elements for purpose of discussion due to their "analytical overlap"); *see also Employers Cas. Co.*, 886 S.W.2d at 475 (explaining that typicality and adequacy analyses employ similar considerations).[17]

---

[16] In his testimony, Professor Issacharoff stated that the typicality element is often subsumed within the adequacy analysis.

[17] We note that in a typical class-action context, courts evaluate whether there is a nexus between the injuries alleged by the class representatives and those of absent class members. *See Employers Cas. Co. v. Texas Ass'n of Sch. Bds. Workers' Comp. Self Ins. Fund*, 886 S.W.2d 470, 475 (Tex. App.—Austin 1994, writ dism'd w.o.j.). Although the representatives' injuries do not have to be identical to the injuries of the class, the presented claims must be based on the same legal theories and must originate from the same course of conduct or event. *Weatherly v. Deloitte & Touche*, 905 S.W.2d 642, 653 (Tex. App.—Houston [14th Dist.] 1995, writ dism'd w.o.j.). As mentioned earlier, the type of class action at issue in this case does not require a class representative. Because no class representative has been appointed, this type of comparison is not possible, and this class action is being pursued on behalf of all of the "absent" class members.

24

In her first set of arguments, Lubin contends that there are several conflicts among the various subclasses and between the attorney general and the class as a whole that prevent either the adequacy or the typicality elements from being satisfied. In particular, Lubin alleges that there are conflicts present within the following paired groups of individuals that should have prohibited certification of this class action: individuals who purchased HO-A policies and those who did not, individuals who were insured under an HO-A policy at the time of settlement and those who let their policies expire, individuals who will benefit under the new discount methodology adopted by Farmers and those who will pay more after the methods are used, the attorney general and the class, and those individuals who want the class to be certified and those who do not. Alternatively, Lubin argues that the typicality and adequacy elements were not met because the attorney general did not and cannot vigorously protect the class members' interests.

---

However, the supreme court determined that in this type of class action, the certification requirements must be generally applied to the claims asserted by the attorney general. *Lubin II*, 222 S.W.3d at 420. In this settlement class action, the attorney general alleged that the members of the various subclasses were injured by the same conduct, particularly by Farmers' decision to discontinue its HO-B polices and to offer HO-A policies instead and by the methods Farmers used to calculate premiums. For example, regarding the Rate Class, the attorney general alleged that the current and former HO-A policyholders were universally charged too much for the coverage provided. Similarly, regarding the Discount Class, the attorney general argued that Farmers' methods for determining premiums resulted in discriminatory rates. Finally, regarding the Credit Usage Notice Class, the attorney general contended that Farmers universally failed to inform the members of this subclass when the use of their credit histories resulted in adverse action (e.g., increased premiums) being taken against them. Accordingly, the claims presented were typical of the various subclasses. Although the Policyholders insist that other claims should have been pursued and not released under the proposed settlement, those arguments do not seem to pertain to a determination regarding whether the claims pursued by the attorney general were typical of the subclasses and, in any event, these arguments will be addressed later in this opinion.

25

**Conflicts**

As mentioned above, Lubin contends that there are fatal conflicts present within various groups involved in the class action that should have prevented certification. When determining whether the requirements for this type of class action have been satisfied, courts should examine whether there exists antagonism among the class members or between the attorney general and the class members. *Cf. E & V Slack, Inc.*, 969 S.W.2d at 568 (explaining that court should consider presence of antagonism in private class actions); *Forsyth*, 903 S.W.2d at 150 (same). In other words, courts should consider potential conflicts of interest. *See Forsyth*, 903 S.W.2d at 150. However, mere speculation regarding potential conflicts is insufficient to negate an adequacy finding. *Employers Cas. Co.*, 886 S.W.2d at 476. Moreover, only conflicts going to the heart of the litigation will defeat the adequacy of representation. *See Phillips Petroleum Co. v. Bowden*, 108 S.W.3d 385, 399 (Tex. App.—Houston [14th Dist.] 2003), *rev'd in part on other grounds*, 247 S.W.3d 690 (Tex. 2008).

*HO-A Policyholders and Non-Policyholders*

Regarding the first alleged conflict, Lubin contends that the proposed settlement creates a conflict "between class members who purchased HO-A policies and those who did not." In making this argument, Lubin asserts that the prospective and the retrospective rate reductions described in the proposed settlement will only be given to "policyholders who were insured under an HO-A policy issued by" Farmers. For this reason, Lubin argues that members of the Rate Class who were notified that their HO-B policies would not be renewed but did not purchase an HO-A policy will not receive any benefit from either type of reduction listed in the agreement.

It is true that, under the proposed settlement, individuals who did not purchase HO-A policies will not receive refunds for overpayments of HO-A premiums, but Lubin's argument that this type of differential recovery creates a fatal conflict ignores the foundation of this class action. This class action was initiated, at least in part, by allegations that Farmers was charging too much for its new HO-A policies given the limited coverage that the policies provided. Unlike for HO-A policies, no allegation was made that Farmers was universally charging HO-B premiums that were too high. For these reasons, individuals who did not purchase an HO-A policy through Farmers did not suffer the particular injury alleged. Accordingly, the proposed settlement did not authorize them to receive the benefit of the prospective and retrospective relief related to HO-A policies. This type of distinction does not seem to be the type of antagonism that justifiably prevents certification.

Moreover, class members who did not purchase HO-A policies may still be entitled to some recovery under the settlement. As discussed previously, the attorney general alleged that Farmers was charging certain individuals premiums that were too high because the methods Farmers used for determining premiums did not accurately take into account individualized risks. Further, some of the allegedly improper methods (discriminatory use of credit histories and age of policyholders' homes) occurred while Farmers was still offering its HO-B policies. For that reason, under the settlement, Farmers agreed to adopt the agreed-upon discounts discussed previously and agreed to compensate current and former HO-A policyholders and former HO-B policyholders provided that they paid premiums that were higher than what they would have been charged had the agreed individual discounts been employed. Similarly, individuals who did not purchase HO-A

policies may be entitled to recovery from the Credit Usage Notice Adjustment Fund if Farmers used incorrect credit information when calculating their premiums.

*Current HO-A Policyholders and Former HO-A Policyholders*

Second, Lubin asserts that there is a conflict between those individuals who purchased HO-A policies before the settlement was proposed and are still insured at the time of settlement and those individuals who purchased HO-A policies before the settlement was proposed but whose policies expired and were not renewed before the settlement. Specifically, Lubin contends that those policyholders who chose not to renew their policies will only be given the retrospective rate reduction but that those people who are insured on the date of settlement will be given the benefit of both the prospective and the retrospective rate reductions.

When making this argument, Lubin essentially raises two issues: (1) whether the denial of prospective relief to former HO-A policyholders created a fatal conflict, and (2) whether the proposed reduction adequately compensates the policyholders. The first assertion is somewhat similar to Lubin's argument regarding a potential conflict between individuals who obtained an HO-A policy and those who never did. As previously mentioned, this class action originated, in part, after allegations were made that Farmers was universally charging HO-A premiums that were too high. To address those concerns, the settlement provided retrospective relief to every individual who had purchased an HO-A policy before the settlement date. Further, the agreement provided prospective relief for those individuals currently insured under an HO-A policy and for those who renew or obtain coverage after the settlement date. In other words, the agreement recognized that individuals who do not renew their HO-A policies with Farmers will also not be paying future

28

premiums to Farmers. The fact that the agreement does not provide prospective relief to individuals who will not be making future premium payments would not seem to create the type of antagonism that would undermine the legitimacy of a class action.

Regarding the issue of whether the reduction is adequate, Lubin points to testimony elicited at trial stating that full restitution for the overcharges made in the past would require that policyholders be given a 13.6% reduction. In light of this testimony, Lubin asserts that the 13.6% recovery was improperly parceled into a 6.8% reduction to be applied to past premiums and a 6.8% reduction to be applied to future premiums. For this reason, Lubin insists that policyholders who did not renew their policies will not achieve the full recovery that they were entitled to. Moreover, Lubin insists that the decision to divide the 13.6% recovery in the manner specified under the agreement denies all class members their full recovery because complete restitution would require that policyholders be refunded 13.6% of the premiums paid in the past and that Farmers' future premium rates also be reduced by 13.6%.[18]

Although characterized as arguments against certification, these assertions are more properly regarded as attacks on the merits of the proposed settlement. For that reason, Lubin's

---

[18] We note that the attorney general originally estimated that Farmers was charging rates that were approximately 12 to 18 percent too high. However, in a letter describing the settlement, David Mattax, a division chief for the attorney general, admitted that more recent data "suggests that 12%" was a more accurate estimate. A similar explanation was provided by Karina Casari, who was the executive deputy commissioner for the Department at the time of the settlement negotiations and who played a key role in those negotiations. Moreover, although we do not decide the fairness issue here, we note that during the certification hearing, the attorney general explained that Farmers would not have paid for additional recovery and that "given the vagaries of litigation," he believed that the recovery obtained through the settlement was fair. Similarly, Professor Issacharoff testified that due to the nature of class actions, they generally settle for less than originally requested.

critique of the terms of the settlement mentioned previously is not ripe for review and is beyond the scope of this appeal. *See McAllen Med. Ctr., Inc.*, 66 S.W.3d at 234 (concluding that attack on settlement terms was not ripe for review but noting that district courts may consider terms of settlement to extent necessary to determine if certification was proper).

*Policyholders Benefitting Under New Discounts and Policyholders Potentially Negatively Impacted*

Third, Lubin contends that the adoption and implementation of the individual discounts discussed above will lead to conflicts among the policyholders. As discussed previously, the proposed settlement only provides recovery for members of the Discount Class who paid higher premiums than they would have had the new discounts been used in their premium determinations. In light of this, Lubin argues that although some policyholders were required to pay more for their premiums than they otherwise should have been, other policyholders were charged premiums that were less than what they would have been charged had the new discounts been in effect. In other words, Lubin asserts that certain policyholders benefitted from the methods that Farmers used to calculate its premiums and that those policyholders will be charged more after the settlement occurs. Accordingly, Lubin insists there is a conflict between class members who benefitted under the old system and those class members who benefit from the terms of the settlement.

As proof of this assertion, Lubin refers to the proposed notice that will be sent to Farmers' current and former policyholders as part of the settlement process. The notice states that "Because some policyholders who do not receive the Individualized Discount Adjustment *benefitted* from the way [Farmers] calculated rates under the previous system, they may see a *net increase* in

30

their premium under the new adopted discounts at their next policy renewal." (Emphasis added.)

As a preliminary matter, we note that the notice simply mentions that the settlement *might* result in some policyholders paying more. Potential conflicts serious enough to prohibit certification of a class action must not be merely speculative. *See Employers Cas. Co.*, 886 S.W.2d at 476. The unsubstantiated nature of that statement does not weigh in favor of a finding that the district court abused its discretion by failing to conclude that there was a fatal conflict rendering certification inappropriate.

Even assuming that certain policyholders will be required to pay higher premium rates if the proposed settlement is approved, that outcome cannot defeat a class action initiated by the attorney general under his statutory authority to correct an insurer's unlawful conduct. The foundation of this suit is that Farmers was improperly charging premiums that were too high and that Farmers' methods for determining individual rates unfairly discriminated against similarly situated individuals, meaning that some policyholders were paying more than they should have been and some were paying less. Farmers has agreed to implement the premium reductions and new discounts in response to allegations that its rating practices did not comply with state law, and none of the Policyholders objecting to the class settlement have argued that Farmers' former business practices did not violate the insurance code or have referred to evidence indicating that any of the proposed class members believe that those practices were consistent with the law. To the contrary, the Policyholders agree that Farmers violated various insurance code provisions but argue that the settlement was inadequate in light of Farmers' other violations.

31

For these reasons, Lubin's description of a potential conflict is akin to arguing that a conflict exists because some individuals benefitted from potentially illegal and discriminatory conduct to the detriment of the other policyholders and would prefer that the improper conduct continue.[19] This type of alleged conflict cannot legitimately serve as a basis for preventing the formation of a class action, particularly one initiated by the attorney general in an attempt to rectify improper business practices.[20] Although individuals paying less under the old methodology would

_____

[19] As support for the assertion that there is a fatal conflict, Lubin cites to *E & V Slack, Inc. v. Shell Oil Co.*, 969 S.W.2d 565 (Tex. App.—Austin 1998, no pet.). That case involved a class action filed against Shell by former fuel-station operators. In that case, former fuel-station operators who purchased gasoline from Shell sued Shell. *Id.* at 566. As part of its sales agreement, Shell allowed operators to take part in a voluntary program that would reduce their rent if they were able to sell certain amounts of fuel. The former operators filed a class action on behalf of all of the past and present operators and asserted that Shell used the program formula to impose additional costs on operators. The trial court denied the certification, and this Court affirmed that decision after concluding that there was a conflict in the class that defeated certification. Specifically, we noted that there was a conflict between the *former* operators pursuing the class action and some of the *current* operators who were also included in the class. The former operators wanted to dissolve the program, and one of them had begun directly competing with Shell. The current operators, however, did not want the class action to be certified because it would damage Shell's reputation and did not want the program discontinued because they benefitted from it. *Id.* at 568-69. In light of this case, Lubin contends that this Court should reverse the district court's certification because there is an allegedly similar conflict.

We disagree. The conflicts present in *Shell* and alleged in this case are very dissimilar. In *Shell*, one of the conflicts that led to the denial of the class certification was the fact that one of the class representatives was now operating a business that directly competed with Shell and, therefore, had different financial motivations than those individuals who still had operating agreements with Shell. Further, the record in *Shell* showed that some members of the class had interests that were *actually* in conflict with the continuation of the class action.

[20] When asserting that there exists intra-class conflict, Lubin also refers to *Phillips Petroleum Co. v. Bowden*, 108 S.W.3d 385 (Tex. App.—Houston [14th Dist.] 2003), *rev'd in part*, 247 S.W.3d 690 (Tex. 2008). In that case, several gas royalty owners initiated a class action against Phillips and asserted that Phillips was not paying the full royalties owed. The class action was divided into three subclasses. The appellate court determined that the adequacy requirement was not met because the suit was challenging the manner in which the royalty payments were calculated and because the

32

no doubt want to avoid paying larger premiums, the desire to pay lower premiums as a result of alleged statutory violations will not defeat the attorney general's ability to file a class action in order to compel Farmers to comply with the governing statutory requirements.[21]

Moreover, Lubin's arguments would essentially foreclose class-action lawsuits for most, if not all, discriminatory claims. Discriminatory rate claims will necessarily involve situations in which some policyholders are allegedly paying more than they should and will likely involve situations in which some policyholders are paying less than they should. We can find nothing in the governing statutes that persuades us that those types of discriminatory claims cannot be resolved through class actions.

Finally, we note that the proposed settlement allows any and all class members to opt out of the class action and pursue their own actions against Farmers if they so choose. Accordingly,

---

alternative method urged by the class would result in some class members receiving smaller royalties than what they were being paid under the challenged method. *Id.* at 399-400 (stating that "a class action cannot be maintained when the class members have opposing interests or when it includes members who benefit from the same acts alleged to be harmful to other class members").

The portion of the case relied on by Lubin was reversed by the supreme court some time after the case at issue was remanded to this Court. Specifically, the supreme court determined that the royalty agreements did not actually allow for the deductions Phillips asserted would have resulted in some members being paid less than they were currently receiving. *Bowden v. Phillips Petroleum Co.*, 247 S.W.3d 690, 707 (Tex. 2008) ("*Bowden II*"). Accordingly, the supreme court reversed the appellate court's determination that the adequacy element had not been satisfied. *Id.* In light of that reversal, we do not believe that the reasoning of the appellate decision compels a conclusion that the district court in this case abused its discretion.

[21] We acknowledge that the class could arguably have been defined in a manner that would have excluded individuals who will be paying more if the settlement is approved and thereby remove this particular challenge to certification. However, excluding those individuals would have led to the same result regarding the new discounts because the excluded individuals would not be required to refund any benefit that they received but would still have to pay more after the class action due to Farmers' decision to apply the new method for calculating discounts to future policies.

33

any class members who believe that they might be hurt by any of the terms in the proposed settlement may opt out of the class.

*Attorney General and the Class*

Fourth, Lubin contends that there is a conflict between the attorney general and the class due to the attorney general's representation of the Commissioner and the Department. *See* Tex. Const. art. IV, § 22 (explaining attorney general's obligation to represent State); Tex. Gov't Code Ann. § 402.021 (West 2005) (same). In particular, Lubin asserts that the Commissioner and the Department have a duty to protect the availability of homeowners' insurance in Texas and, therefore, had an interest in encouraging Farmers to remain in Texas; however, Lubin insists that this interest is in conflict with the class's interest in obtaining the maximum monetary benefit from Farmers. Moreover, Lubin insists that a class action initiated by class members would not suffer from the drawbacks of this type of dual representation. For these reasons, Lubin urges that the attorney general's representation of the Commissioner and the Department creates a conflict between the attorney general and the class and that this conflict prevents the attorney general from adequately representing the needs of the class.

Given that these types of class actions will always be filed against insurers providing coverage in Texas, this same potential conflict would, under Lubin's argument, prevent the attorney general from ever filing a class action. *Cf. South Dakota v. United States Dep't of Interior*, 317 F.3d 783, 786 (8th Cir. 2003) (noting that merely theoretical conflicts of interest do not render government inadequate representative in class actions). When addressing this possibility, the supreme court acknowledged that there might be instances in which the attorney general will have

34

conflicts "so serious" that he cannot adequately represent a class, but the supreme court also determined that the attorney general's "public duties to all Texans cannot alone create such a conflict without again rendering all such class actions impossible." *Lubin II*, 222 S.W.3d at 426.

Moreover, other than simply asserting that this conflict might exist, Lubin does not substantiate that claim, and the evidence presented during trial contradicts the assertion that a fatal conflict exists. For example, Lubin's assertion ignores the fact that prior to this class action being filed, the Department began an administrative proceeding against Farmers and issued an emergency cease-and-desist order, requiring Farmers to change its rating practices. *See* Tex. Ins. Code Ann. § 83.051 (West 2009) (authorizing Commissioner to issue emergency cease-and-desist order if, among other things, he believes insurer is committing unfair act that is fraudulent, endangers public safety, or is causing or will cause imminent public injury). In other words, the Commissioner and the Department were acting on behalf of Farmers' policyholders in a manner that was contrary to Farmers' interests and, in fact, in a manner that could have led to Farmers leaving the Texas insurance market. When addressing the possibility of Farmers leaving, several witnesses testified during the certification hearing that the Department had planned for the possibility that Farmers might leave the market and that the Department was willing and prepared to let Farmers leave the State if Farmers did not adequately compensate the various injured parties. In fact, Karina Casari, the executive deputy commissioner for the Department, testified that there was a sufficient number of companies providing insurance in Texas to cover any policyholders affected by Farmers' decision to leave the Texas market. Casari also testified that the Department was looking into establishing

35

an "insurer-run facility governed by the State" in the event that Farmers left and that not all of its former policyholders were able to obtain coverage with a new company.

*Class Members Favoring Class Action and Class Members Opposed*

Fifth, Lubin notes that because there are no class representatives, there is not a single class member who supports the certification or the settlement. More importantly, Lubin notes that those class members who are actively involved in the class action all oppose class certification. For this reason alone, Lubin urges that there is fatal intra-class antagonism. To support this assertion, Lubin principally relies on *Forsyth*, in which this Court determined that intra-class antagonism existed because a majority of the class members actively participating in the class action opposed certification. 903 S.W.2d at 151-52.

Lubin's argument does not account for the fact that the type of class action at issue in this case does not require class representatives. Because no class representatives need be or were selected, it is not possible to perform the type of weighing analysis articulated in *Forsyth*. Moreover, given that this class action was initiated to correct Farmers' allegedly unlawful conduct, we do not believe that the weighing analysis has any applicability here. However, even assuming that a similar weighing analysis could be performed, given that the class in this case is so much larger than the class involved in *Forsyth*, it is not entirely clear that it would be appropriate to allow the objections raised by only five policyholders to unravel a class action that encompasses hundreds of thousands, perhaps millions, of policyholders.

36

For the reasons previously given, we cannot conclude that the district court abused its discretion by failing to find the existence of nonspeculative conflicts that were fatal to the class certification in this case.

**Vigorous Prosecution**

In addition to asserting the existence of conflicts strong enough to deny certification, Lubin contends, in essentially two sets of arguments, that the attorney general could not and did not vigorously protect the interests of the class. *See E & V Slack, Inc.*, 969 S.W.2d at 568 (explaining that one of key components to consider in adequacy determination is whether class representatives will vigorously prosecute class members' claims and defenses).

In her first set of arguments, Lubin asserts that the attorney general did not vigorously prosecute the class members' claims because when negotiating the settlement, the attorney general abandoned the class members' most valuable claims in return for a simple refund of inflated premiums. Lubin also contends that even if the attorney general had not abandoned the claims, the attorney general would not have had standing to make those complaints.

For example, Lubin insists that Farmers violated the Fair Credit Reporting Act by using policyholders' credit reports without informing policyholders when the use of their credit histories resulted in "adverse action." *See* 15 U.S.C.A. § 1681m (West 1998 & Supp. 2009) (imposing disclosure obligations on individuals who use credit information). However, Lubin argues that the attorney general agreed to abandon those claims under the proposed settlement and would have been unable to prosecute those claims anyway because those types of claims must be filed by a "consumer." *See id.* § 1681n (West 1998 & Supp. 2009) (listing penalties that consumer may

37

collect for violation of disclosure requirements). Similarly, Lubin insists that Farmers engaged in discriminatory practices but that the terms of the proposed settlement foreclose the pursuit of various discrimination claims under the former provisions of the insurance code by the injured policyholders. *See* former Tex. Ins. Code art. 21.21-8, § 2 (prohibiting insurers from engaging in unfairly discriminatory behavior). Moreover, Lubin asserts that the attorney general could not have pursued the discriminatory claims even if he wanted to because those claims must be initiated by "a *person* who has sustained economic damages" as a result of discriminatory practices. *See id.* art. 21.21-8, § 3 (emphasis added). Finally, Lubin contends that the proposed settlement precludes class members from suing Farmers on the ground that Farmers charged excessive management fees and argues that the attorney general could not have pursued that claim anyway because the claim must be pursued by individuals to whom an insurer owes a fiduciary duty.[22] *See Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 176-77 (Tex. 1997) (explaining circumstances in which fiduciary duties may arise).

It is not disputed that the proposed settlement agreement releases the claims mentioned above and others as well. *See Daccach*, 217 S.W.3d at 450 (holding that "claims not pursued, or abandoned, in a class suit seeking damages that proceeds to final judgment on other claims arising from the same subject matter are subject to preclusion"). However, Lubin's

---

[22] Lubin insists that the credit-reporting, discrimination, and management-fee claims had potential values that exceeded the total value of the proposed settlement agreement. *See* 15 U.S.C.A. § 1681n (West 1998 & Supp. 2009) (stating that person who wilfully violates credit reporting act is liable for actual damages or "damages of not less than $100 and not more than $1,000"); former Tex. Ins. Code art. 21.21-8, § 3(b)(1) (allowing person who has been subject of discriminatory practice to obtain civil penalty up to $25,000 if discriminatory action was committed "knowingly").

arguments regarding the decision to release these claims are more properly viewed as attacks on the adequacy of the proposed settlement rather than attacks on the attorney general's ability to adequately represent the class.[23]  *See Lubin II*, 222 S.W.3d at 426 n.55.  For reasons discussed previously, any attack on the fairness or adequacy of the proposed settlement is premature and outside the scope of this appeal.  *See McAllen Med. Ctr., Inc.*, 66 S.W.3d at 234.[24]

In her second set of arguments, Lubin argues that when the attorney general decided to settle the various claims, he did not fairly evaluate the value of the claims that were abandoned. As proof of this assertion, Lubin points to the testimony of Jeffery Boyd, who worked for the attorney general's office and was involved in the negotiations with Farmers.  In his testimony, Boyd stated that he did not know if anyone had calculated the value of certain claims before agreeing to the settlement.  Specifically, he testified as follows:

---

[23]  Although we need not decide the matter here, we do note that evidence was presented during the certification hearing suggesting that the premium-rate reductions formulated under the proposed settlement will also lead to a reduction in the management fees that Farmers charges because those fees are determined by the amount of premium collected.

[24]  We note that when the supreme court remanded this case back to this Court, it suggested that the attorney general's decision to forgo certain claims did not render his representation inadequate.  In particular, the court noted that the former insurance code provisions gave precedence to administrative class actions, which only allowed for the recovery of premium refunds, over other types of class actions and surmised that the legislature's decision to elevate administrative class actions "suggests that attorneys general are not inadequate representatives merely because a private litigant might demand more."  *Lubin II*, 222 S.W.3d at 426.

Further, although we do not reach the fairness issue here, we note that in the court below and on appeal, Farmers identified several defenses to many of the released claims that it alleged would have prohibited Farmers from being held liable for those claims.  When discussing the defenses to the credit-reporting claim, the district court stated that "there is a good . . . defense that Farmers has that potentially . . . eliminates the cause of action advanced."

39

If you want to sit down and say, what's this claim worth and start estimating anything beyond that, you know, I don't know that we sat down to calculate.

. . .

[W]hat's the very most we could get if we asserted this individual claim? I don't know that anyone did that.

Further, Lubin insists that the attorney general refused to negotiate a settlement that did not release the claims Lubin wanted to pursue and abdicated his duty to vigorously represent the class members' interests by choosing to allow the courts, rather than himself, to decide whether the proposed settlement was fair.[25] As support for the argument that the attorney general refused to consider a settlement that did not release the claims discussed above, Lubin refers to additional testimony from Boyd in which he communicated that the attorney general believed that recovery

---

[25] In a related point, Lubin asserts that Farmers coerced the attorney general "into converting his enforcement action into a settlement class" and that the attorney general simply agreed to release all of the claims of the policyholders due to pressure from Farmers. As support for this assertion, Lubin points to a provision in a prior version of the proposed settlement that stated that the attorney general's lawsuit was switched to a class action for the benefit of Farmers.

Even assuming that Farmers was the driving force behind the decision to transform this lawsuit into a class action, that fact alone would not render the attorney general's representation of the class inadequate. Additionally, as will be more thoroughly discussed later, there was evidence that the attorney general and the Department were not coerced into settling their various lawsuits through a settlement class action. In fact, the evidence shows that they were willing to allow Farmers to leave the Texas market rather than settle the various lawsuits on terms that they believed were unfavorable to the policyholders. Moreover, the attorney general repeatedly informed Farmers that he was not going to accept a proposed settlement that did not include restitution for injured policyholders in addition to rate reductions. In light of this evidence, we cannot conclude that the district court abused its discretion by failing to conclude that a provision in an earlier version of the settlement agreement, which documented Farmers' desire to settle the claims through a class action, showed that the adequacy requirement was not met in this case.

under the statutory provisions described above would have been windfalls to the policyholders and

would have inappropriately punished Farmers to an excessive degree.[26]

---

[26] After this case was remanded, Lubin filed a post-submission letter brief noting subsequent class actions that have been filed in other states since this case was originally appealed. In particular, Lubin refers to several class-action suits filed against Farmers that included claims similar to the ones abandoned by the attorney general in this case, including excessive management-fees claims and alleged violations of the Fair Credit Reporting Act. *See, e.g.*, *Fogel v. Farmers Group, Inc.*, 74 Cal. Rptr. 3d 61 (Cal. Ct. App. 2d Dist. 2008) (dealing with excessive fees). In light of these class actions, Lubin contends that the abandoned claims are valuable and that the attorney general's decision to abandon them undermines the district court's determination that the adequacy and typicality elements were met in this case.

In addition to her post-submission letter briefs, Lubin also filed a motion asking this Court to remand the case to the district court instead of addressing the merits of the issues on appeal. In particular, Lubin argues that the district court should be given the opportunity to revisit its certification determination in light of the supreme court's holding in *Lubin II*. Further, Lubin comments that "the landscape informing the trial court's" prior determination "has changed significantly" and, as support for that assertion, points to a federal class action that was filed against Farmers after the district court originally certified the class in this case. The federal case concerns allegations that Farmers violated the Fair Credit Reporting Act, and Lubin asserts that the district court should be given the opportunity to "consider the prospect that approval of the class settlement [in this case] would interfere with the federal court's jurisdiction and violate" the federal rules of civil procedure.

In determining whether the district court abused its discretion, we are necessarily limited to the record that was before the district court at the time of certification. In this case, the district court considered the preclusive effect of abandoning the claims asserted by Lubin. *See Bowden II*, 247 S.W.3d at 698 (requiring trial courts to "assess the [certification] requirements in light of res judicata's preclusive effect on abandoned claims when considering whether to certify a class"); *see also Citizens Ins. Co. of Am. v. Daccach*, 217 S.W.3d 430, 448 (Tex. 2007) (concluding that trial court abused its discretion by certifying class without considering adequacy of class representative in light of res judicata effect on decision to abandon claims). Nothing in the record persuades us that the district court abused its discretion by certifying the class in light of the abandoned claims. However, nothing in our opinion should be read as foreclosing the trial court from considering these subsequent developments or from modifying its certification order in light of those developments. *See* Tex. R. Civ. P. 42(c)(1)(C) (explaining that trial court may alter or amend its certification order "before final judgment"); *see also Bailey v. Kemper Cas. Ins. Co.*, 83 S.W.3d 840, 848 (Tex. App.—Texarkana 2002, pet. dism'd w.o.j.) (noting that trial courts have responsibility to respond to changes that occur throughout pendency of case). Similarly, although we overrule

As with Lubin's previous set of arguments, the claims regarding the release of certain claims essentially attack the fairness of the terms of the settlement rather than the ability of the attorney general to effectively pursue the class action.[27]  Moreover, although Boyd testified that he was unaware of any specific calculations occurring, his testimony was referring to the claims of the Credit Usage Notice Class.  As discussed earlier, although the exact value of the recovery for those claims was not determined at the time of certification, the proposed settlement guarantees that the class members will recover 100% of any overpayments that they made as the result of inaccurate credit information.[28]  Furthermore, Boyd testified that the attorney general worked with the Department to develop reasonable estimates for the value of the claims at issue in this case.[29]

---

Lubin's motion to remand the case, that determination should not be read as precluding the district court from considering the arguments raised in Lubin's motion should Lubin raise them before the district court.

[27]  As previously mentioned, the propriety of the attorney general's decision to not seek statutory penalties is more germane to a fairness hearing than a certification hearing.  However, we do note that the supreme court determination that an attorney general's duty to all of the citizens of Texas does not render his representation inadequate, *Lubin II*, 222 S.W.3d at 426, would seem to have some applicability to the attorney general's decision to propose and obtain a settlement that limits recovery to damages that the class members actually sustained rather than pursuing more exacting monetary penalties.  In other words, even if the attorney general chose not to pursue statutory penalties in order to protect the Texas citizenry from the possibility that Farmers might leave the Texas insurance market, this decision would not seem to automatically render his representation inadequate. We further note that Professor Issacharoff testified that statutory penalties generally have no applicability in class actions even when the statutes contain mandatory language because the number of people involved would result in inappropriately excessive penalties.

[28] In his testimony, Professor Issacharoff indicated that the inability to determine a precise recovery amount is not unusual in class actions.  Specifically, he stated that in most class actions it is not possible to inform class members how much they will be recovering before settlement because the amount ultimately recovered will be reduced on a pro rata basis.  However, unlike typical class actions, the proposed settlement in this case provides a guaranteed recovery that will not be reduced depending on the number of class members that participate in the class action.

[29] Professor Issacharoff also testified that when evaluating a settlement, the class counsel should estimate the value of the claims released by the settlement.

Regarding the district court's role in the fairness of the settlement, Boyd did repeatedly assert the proposition that the court should review the fairness of the proposed settlement and that it should not approve the settlement if it believed that the terms were unfair. However, he also testified that both he and the attorney general believed that the settlement was fair and would not have filed the proposed settlement otherwise.

In addition to this testimony, the terms of the proposed settlement and the evidence presented regarding the negotiations between Farmers and the attorney general and the Department support the district court's determination that the attorney general's representation satisfied the adequacy element and that the attorney general was actively pursuing the class members' interests. Regarding the negotiations, deputy commissioner Casari testified that the attorney general and the Department rejected Farmers' initial settlement proposal, which only addressed a small percentage of the problems identified by the attorney general and which provided no restitution for overpayments made by policyholders.[30] Further, Casari explained that the Department always insisted that Farmers would have to provide some form of restitution and that the Department's primary concern was protecting the policyholders. Similarly, Boyd testified that Farmers was originally adamant about not paying any type of restitution to its current and former policyholders but that the attorney general, on several occasions, threatened to leave the negotiations if Farmers did not agree to provide some form of relief for past overpayments. In addition, he testified that the attorney general insisted that he would not settle for anything less than a complete recovery for members of the Discount Class and Credit Usage Notice Class. Further, Boyd communicated that

---

[30] During her testimony, Casari explained that the Department was heavily involved in the settlement process.

43

during the negotiations, the attorney general insisted that any settlement must require Farmers to change its credit notices and include language that more clearly indicates when a policyholder's premiums have been increased due to his or her credit information. Lastly, Boyd communicated that the attorney general fought to include a provision within the settlement allowing the attorney general to back out of the settlement if a sufficient number of the class members express their dissatisfaction with the proposed agreement by choosing to opt out of the settlement.

As described earlier, under the proposed settlement, Farmers ultimately agreed to these demands. First, Farmers agreed to provide retrospective and prospective rate relief and complete recovery for the Discount Class and the Credit Usage Notice Class. In fact, under the terms of the settlement, Farmers agreed to fund one of the largest insurance settlements in this State's history.[31] Second, Farmers agreed to adopt a new credit notice that will inform policyholders when their credit histories result in adverse action regarding their policies and also agreed to estimate the financial impact of the adverse actions. Third, as mentioned previously, the proposed settlement allows the attorney general as well as Farmers to abandon the settlement if the class members are dissatisfied with the settlement and also allows each class member to opt out of the class action if he or she so desires.[32]

---

[31] It is worth noting that after discussing the amount of recovery obtained for each of the subclasses and potential defenses to the released claims, the district court stated, "I do not think either the private plaintiffs or the State bear much likelihood of getting a better result even with a trial."

[32] Regarding the opt-out provisions, Professor Issacharoff testified that it was unusual for class-action settlements to allow individuals other than defendants to discontinue the settlement process. Further, he testified that the opt-out provision affords class members additional protection by letting them decide whether to pursue their own individual claims.

Additionally, although it does not directly bear upon the claims advanced by the Policyholders, we note that as part of his investigation, the attorney general had alleged that Farmers was inappropriately tying its homeowners and automobile insurance policies together, meaning that it would not issue either type of policy unless the potential policyholder agreed to buy both types of insurance from Farmers. As part of the proposed settlement, Farmers agreed to not require "individuals desiring to purchase homeowners insurance from [Farmers] also purchase automobile insurance from [Farmers], or vice versa, and not to refuse to deal in good faith with any homeowners insurance customer who purchases automobile insurance from another carrier, or vice versa."

Moreover, when determining whether the typicality and adequacy requirements are met, courts should consider "the zeal and competence of class counsel," *see E & V Slack, Inc.*, 969 S.W.2d at 569, and in light of that proposition, we note that Lubin's challenges to the adequacy determination ignore the unique position that the attorney general serves in the State. The attorney general's role as representative for the State gives him unparalleled experience regarding insurance law in Texas. *Cf. In re Antibiotics Antitrust Actions*, 333 F. Supp. 278, 280-81 (S.D.N.Y. 1971) (explaining that attorney generals are able to provide class with experienced counsel and have sufficient resources to maintain action). Moreover, the attorney general's status as a publicly elected official answerable to the people of Texas and to the hundreds of thousands of policyholders who are members of this class action would seem to provide additional assurance that the attorney general is acting with the requisite amount of zeal. *Cf. Leonard*, 125 S.W.3d at 67 (stating that court may consider class representative's desire to protect class members when determining if class-action requirements have been met).

In addition to not addressing the attorney general's position in the State, Lubin's arguments ignore the unique advantages that the attorney general has over a private litigant attempting to pursue a similar class action, including the investigative powers he employed while examining Farmers' business practices. Because citizens routinely file complaints against insurers with the attorney general's office, the attorney general had access to information pertaining to Farmers' business practices prior to filing suit. Additionally, prior to filing suit, the attorney general served Farmers with various civil investigative demands. *See* Tex. Bus. & Com. Code Ann. § 17.61. Consequently, he is uniquely familiar with the subject matter forming the foundation of this suit. *See Leonard*, 125 S.W.3d at 67 (explaining that familiarity with subject matter of suit is relevant consideration when determining if class-action requirements have been satisfied); *Forsyth*, 903 S.W.2d at 150 (same).

Finally, because the attorney general initiated this proceeding on behalf of and in conjunction with the Department, the attorney general's bargaining position was enhanced by the Department's ability to impose significant penalties on insurers for insurance code violations. *See* Tex. Ins. Code Ann. § 84.021 (West 2009) (authorizing imposition of various administrative penalties). It seems logical to assume that the threat and coercive effect of these additional enforcement provisions, which would not be available in private class actions, weighed heavily in Farmers' decision to agree to the proposed settlement.

That supposition is confirmed by the testimony of Stephen Leaman, the vice president for Farmers. As discussed previously, prior to the certification of this class action, the Commissioner issued a cease-and-desist order, compelling Farmers to discontinue some of its allegedly improper conduct. When explaining why Farmers agreed to enter the settlement

agreement, Leaman testified that the cease-and-desist order forced Farmers to chose between leaving

the Texas market or succumbing to the pressure and settling the claims made by the attorney general.

In light of the effect of the cease-and-desist order, Leaman stated that a private litigant, even in a

class-action format, would not have been able to apply the same level of pressure as the attorney

general did during the negotiations.[33]

For all the reasons previously expressed, we cannot conclude that the district court

abused its discretion by concluding that the adequacy and typicality requirements were met. *See*

*Leonard*, 125 S.W.3d at 66 (explaining that trial courts do not abuse their discretion by concluding

that adequacy requirement was met if there is evidence to support determination).[34]

*Predominance and Superiority*

Lubin also challenges the district court's conclusion that the common questions of

law and fact predominate over individual questions. *See Lapray*, 135 S.W.3d at 663 (stating that

predominance is one of more stringent prerequisites for certification). In arguing that the

predominance requirement is not met, Lubin asserts that because the class action is based on claims

---

[33] During the certification hearing, Professor Issacharoff stated that the cease-and-desist order was crucial to forcing the settlement and that it gave the attorney general additional leverage.

[34] In addition to potential conflicts and vigorous advocacy, courts have identified other factors to consider in more traditional class actions when determining whether the typicality and adequacy prerequisites have been met. For example, courts may consider the personal integrity of the plaintiffs, any geographical limitations affecting the manageability of the class, and whether the plaintiffs can afford to finance the case. *See Farmers Ins. Exch. v. Leonard*, 125 S.W.3d 55, 67 (Tex. App.—Austin 2003, pet. denied); *Forsyth v. Lake LBJ Inv. Corp.*, 903 S.W.2d 146, 150 (Tex. App.—Austin 1995, writ dism'd w.o.j.). However, because this case was filed by the attorney general without class representatives and is a settlement class action, these factors have no applicability here.

47

of misrepresentation and failures to disclose information, the attorney general will be required to prove individual reliance for each class member. *See Stromboe*, 102 S.W.3d at 693 (explaining that reliance is element of misrepresentation claim); *Swanson*, 959 S.W.2d at 181 (stating that reliance is element of fraud by non-disclosure claim). Because individual reliance is an element that will have to be proven, Lubin insists that the class-action certification was improper. *Cf. Stromboe*, 102 S.W.3d at 693-94 (concluding that class certification was improper, in part, because record did not support finding of class-wide reliance due to fact that some class members did not rely on statement).[35]

As a preliminary matter, we note that it is not entirely clear that individual reliance is actually an element of the claims made by the State because the claims do not seem to pertain to any representation made by Farmers or to any conduct that the policyholders engaged in. As mentioned previously, the claims are based on allegations that Farmers overcharged its former and current policyholders through the manner in which it determined premium rates and that these overcharges were done on a uniform and systematic basis. Specifically, the attorney general alleged that Farmers charged all of its former and current HO-A policyholders excessive premiums for the coverage provided by the HO-A policies. Moreover, the attorney general alleged that Farmers unfairly used its policyholders' credit scores and the ages of their homes when determining premium

---

[35] In a related assertion, Lubin argues that because the attorney general was pursuing claims that could not permissibly be certified, the attorney general had little if any bargaining power, which according to Lubin led to a one-sided settlement dramatically in favor of Farmers. For reasons discussed previously, it would be premature to comment on the fairness of the proposed settlement in this case, but we do note that the reasoning supporting our ultimate determination that the district court did not abuse its discretion by concluding that the typicality and adequacy requirements were satisfied would also seem to support a determination that the district court did not abuse its discretion by failing to conclude that the attorney general was rendered ineffectual by a weak bargaining position.

rates, which led to individuals with similar risk profiles being charged different premiums. Also, the attorney general contended that Farmers failed to consider the geographic location of its policyholders' homes when determining their HO-A premiums. Finally, the attorney general alleged that Farmers improperly failed to inform its policyholders when their credit histories resulted in higher premiums, which denied policyholders of the opportunity to verify the accuracy of the credit information Farmers was using and led to Farmers charging some of its policyholders premiums that were too high due to erroneous credit information. In making these claims, the State did not specifically allege that Farmers made any specific misrepresentations to its policyholders or that the policyholders relied on those misrepresentations.

Moreover, although subsection 16(a) of former article 21.21 of the insurance code did list "reliance" as an element that must be proven in cases in which it is alleged that an insurer engaged in "unfair or deceptive acts or practices," that requirement was limited to suits involving a "deceptive act or practice enumerated in" subsection 17.46(b) of the Deceptive Trade Practices Act. Former Tex. Ins. Code art. 21.21, § 16(a). None of the deceptive practices or acts listed in that portion of the Deceptive Trade Practices Act are at issue in this case. *See* Tex. Bus. & Com. Code Ann. § 17.46(b) (West Supp. 2008).

Even assuming that individual reliance is an element of the claims asserted, we would still be unable to conclude that the district court abused its discretion by determining that the predominance element had been met. In light of the State's allegations discussed above, any individual reliance issues would not predominate over the common issues. *E & V Slack, Inc.*, 969 S.W.2d at 569 (acknowledging that predominance requirement is met if focus of efforts of litigants and court will be on common issues and stating that it is not necessary for common issues

49

to outnumber individual ones). The predominate issue inherent in these claims is whether Farmers overcharged its policyholders, not whether Farmers made individual misrepresentations. *See Chastain*, 26 S.W.3d at 34 (explaining that in class-action suit alleging that storage company charged its customers for insurance but did not obtain policy, predominate issue was whether customers were improperly charged fee, not whether company made individual misrepresentations). Furthermore, to the extent that proof of reliance would be required in this type of case involving allegations of "uniform" misconduct by Farmers in the premiums it charges, payment by the policyholders, on its own, would constitute proof of reliance. *See Alford Chevrolet-Geo v. Jones*, 91 S.W.3d 396, 405-06 (Tex. App.—Texarkana 2002, pet. denied) (stating that allegation that customers paid taxes that they did not owe after being billed for them was allegation of reliance); *see also Stromboe*, 102 S.W.3d at 693-94 (explaining that there may be circumstances in which reliance may be proven by class-wide evidence).

Moreover, were we to adopt Lubin's assertion that the predominance element cannot be satisfied in this case because of the need for proof of individual reliance, that would effectively prohibit the attorney general from pursuing any class actions in which a claim is made that insurers charged their policyholders premium rates that were too high even though the legislature directly empowered the attorney general to file class actions on behalf of policyholders that have been injured by an insurer's actions. *See* former Tex. Ins. Code art. 21.21, § 17; *see also id.* § 4 (listing various unlawful methods, acts, or practices).

Regardless of whether reliance is an element of the claims pursued, Lubin's assertions ignore the fact that this case involves a settlement class action. While it is true that members of non-settlement class actions are held to the same level of proof that would be required for individual

50

suits, *see Stromboe*, 102 S.W.3d at 693-94, a settlement class action by its nature cannot require the same level of proof. The proposed settlement contemplates giving awards without any need for class members to offer any evidence of reliance. Accordingly, if the settlement is approved, proof of individual reliance for the claims made by the attorney general will not be required, and there will be no trial. *Cf. Capital One Bank v. Rollins*, 106 S.W.3d 286, 294 (Tex. App.—Houston [1st Dist.] 2003, no pet.) (explaining that predominance requirement is not met if "the sheer complexity and diversity of the individual issues" would overwhelm or confuse *trier of fact*).

Although proof of individual reliance may not be required, we acknowledge that individual considerations will have to be addressed when determining each class member's individual recovery. For example, the attorney general alleged that Farmers was charging HO-A premiums that were too high for the type of coverage provided, and the proposed settlement calls for a flat-rate reduction to the premium Farmers charged and will charge its policyholders for future HO-A policies. Because the amount of the individual premiums Farmers charged varied, the retrospective recovery for each individual in the Rate Class will depend on the premiums actually paid. As with the Rate Class, the retrospective recovery for the Discount Class will depend on individual information because the recovery is designed to compensate policyholders who were charged rates that were higher than they would have been had Farmers properly accounted for the age and location of their homes and their credit histories. However, under the proposed settlement, the individual information for both types of awards will be obtained from Farmers' records showing the premium amounts paid and the discounts, if any, that should have been given to its policyholders.[36] *See Entex v. City of Pearland*, 990 S.W.2d 904, 917 (Tex. App.—Houston

---

[36] Under the agreement, the Department was charged with the task of verifying that Farmers accurately calculates the class members' awards.

51

[14th Dist.] 1999, no pet.) (explaining that need for individual determinations regarding damages for class members does not prevent certification of class).

Unlike for members of the Rate Class and Discount Class, individuals in the Credit Usage Notice Class seeking recovery will have to submit some information to Farmers. As described earlier, this recovery is designed to compensate individuals who were inappropriately charged higher rates because of mistakes in their credit reports. To obtain recovery, policyholders will have to submit current and correct credit reports in order to ascertain whether Farmers charged rates based on incorrect information. But, as with the other subclasses, the amount of the awards will be determined from Farmers' records without the need for any additional information from the policyholders.

Regarding superiority, we note that Lubin does not directly challenge that component of the predominance element. In order for this element to be met, a court must determine that a class action is superior to other methods for fairly adjudicating the controversy. *E & V Slack, Inc.*, 969 S.W.2d at 571. When determining whether this component is met, courts may consider the interest that class members may have in "individually controlling the prosecution or defense of separate actions," "the extent and nature of any litigation concerning the controversy already commenced by or against members of the class," the desirability of pursuing the suit in the particular forum, and "the difficulties likely to be encountered in the management of a class action." *See Leonard*, 125 S.W.3d at 70; *see also* former Tex. Ins. Code art. 21.21, § 18(b)(3) (listing factors for court to consider when determining if predominance and superiority are met). In addition to the factors previously listed, courts have also considered the potential size of the individual awards, the

feasibility of traditional litigation, and the time and effort the trial court invested in familiarizing itself with the issues in the class action. *See Leonard*, 125 S.W.3d at 70; *Remington Arms Co., Inc. v. Luna*, 966 S.W.2d 641, 643 (Tex. App.—San Antonio 1998, pet. denied).

Nothing in the record compels a determination that pursuing the class action in Travis County is less desirable than other potential venues, particularly in light of the fact that several of the Policyholders had attempted to file class actions raising similar issues in Travis County. Moreover, given that this is a settlement class action, there are no potential litigation class-management issues or potential litigation expenses that would undermine a superiority finding. *Compare E & V Slack, Inc.*, 969 S.W.2d at 571 (stating that litigation-expense and class-management issues are relevant to superiority determination), *and Leonard*, 125 S.W.3d at 70 (highlighting that courts should consider difficulties in managing class action), *with Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 620 (1997) (explaining that courts do not need to consider "whether the case, if tried, would present intractable management problems" in settlement class actions because "the proposal is that there be no trial").

Although the amount of money at issue in this case is estimated to be quite large, the number of policyholders involved indicates that the amount of recovery that individual policyholders might actually obtain will be relatively small. *See Leonard*, 125 S.W.3d at 70 (noting that "marginal case value for individual cases" can be important consideration in determining whether superiority requirement is met). Indeed, during the certification hearing, the Commissioner testified that the maximum recovery any class member would likely obtain as a result of the adoption of the new discounts is $600. The modest potential individual recovery weighs in favor of class certification

because class actions are designed to provide efficient means for claimants with common issues to obtain a remedy when it would not be economically feasible to obtain recovery through multiple individual suits. *Bloyed*, 916 S.W.2d at 952. Furthermore, given that individual recovery will largely depend on an examination of Farmers' records and will not require the introduction of individualized evidence, the interests of judicial economy also weigh in favor of a finding of superiority. *See E & V Slack, Inc.*, 969 S.W.2d at 571 (noting that mini-trials to determine individual recovery undermine economy-of-scale justification for class action). Finally, we note that as part of this certification proceeding, the trial court held extensive hearings and reviewed numerous documents outlining the foundation for this lawsuit. Accordingly, the court invested significant time and effort in familiarizing itself with the issues presented in this case.

It is true that the Policyholders have filed or are members of other lawsuits regarding the conduct forming the basis for this class action. However, given the facts that the other lawsuits were also class actions and that the Policyholders want those class actions to proceed, we cannot conclude that the district court abused its discretion by failing to find that the Policyholders had an interest in *individually* controlling direction of their own cases that was sufficient to overwhelm the other factors weighing in favor of a superiority determination in this case.

For all of these reasons, we cannot conclude that the district court abused its discretion by concluding that the predominance requirement was satisfied.

Having found no abuse of discretion in the district court's determination that the prerequisites to class certification had been met, we overrule Lubin's first issue on appeal.

**Scope of Former Article 21.21**

On appeal, Lubin also asserts that the district court abused its discretion by certifying this class action because the allegations forming the basis for this suit exceed the scope of the former insurance code provisions governing this case. As support for this argument, Lubin refers to the attorney general's second amended petition.[37] The petition contains nine paragraphs under the section titled "Causes of Action." Each of the nine paragraphs lists conduct engaged in by Farmers that allegedly violated various former insurance code provisions and the deceptive trade practices act. Specifically, in his petition, the attorney general alleged the following misconduct:

- Farmers used credit histories, home ages, and home locations for the purpose of determining premiums in a discriminatory and inconsistent manner

- Farmers improperly used various factors and information in a manner that led to increased premium rates[38]

- Farmers did not inform its policyholders when their credit histories resulted in increased premiums

- Farmers improperly collected management fees, which resulted in increased premium rates

---

[37] In her briefs, Lubin also refers to the letter sent by the Commissioner asking the attorney general to initiate this class action. In that letter, the Commissioner listed questions that the class action "should address." Because the common questions are similar to those listed in the second amended petition, we will limit our discussion to the allegations made in the petition.

[38] In particular, the attorney general alleged that Farmers used "a catastrophe load factor" and "excessive target rate of return, excessive trend factors[,] and an excessive length of trending periods." During the settlement hearing, the attorney general explained that the catastrophe load and trend factors as well as the collection of management fees all formed part of the basis for his assertion that the HO-A policy premiums were excessive.

- Farmers improperly switched policyholders from one insurance company to another, which resulted in increased premiums

The attorney general repeated many of these allegations in the portion of his petition detailing "common questions in this case" and also listed an allegation that Farmers may have violated "state antitrust laws." As mentioned previously, the attorney general alleged that Farmers was improperly tying the sale of its homeowners insurance policies with its automobile insurance policies and that Farmers' discontinuance of its HO-B policies essentially constituted an unlawful boycott of those types of policies.

The petition alleged that the conduct listed above violated former article 21.21, section 3, which prohibited insurers from engaging in an "unfair method of competition or an unfair or deceptive act or practice in the business of insurance." Former Tex. Ins. Code art. 21.21, § 3; *see also id.* § 4 (listing prohibited acts or practices). Furthermore, the petition contended that some of the conduct listed violated former article 21.21-6, which prohibited insurers from charging an individual a different rate or refusing to insure an individual because of specific demographic information, including the individual's race, gender, religion, or geographic location. *Id.* art. 21.21-6, § 3. Also, the petition stated that some of the listed conduct violated former article 21.21-8, which prohibited insurers from unfairly discriminating "between individuals of the same class and of essentially the same hazard." *Id.* art. 21.21-8, § 2.

In light of the preceding, Lubin contends that this class action exceeds the scope of the governing statutes because the attorney general is not authorized to file class actions based on conduct that violated former articles 21.21, section 3; 21.21-6; or 21.21-8. In particular, Lubin notes

that former section 17 only allowed a class action when "a member of the insurance buying public has been damaged by an unlawful method, act, or practice *defined in Section 4 of this Article* as an unlawful deceptive trade practice." *Id.* art. 21.21, § 17(a) (emphasis added). In light of this language, Lubin asserts that the attorney general may only maintain a class action based on conduct listed in former section 4 but insists that the type of conduct forming the basis for this suit does not fall within any of the eleven types of prohibited behaviors described in former section 4. *See id.* § 4 (listing eleven groups of "unfair methods of competition and unfair and deceptive acts or practices in the business of insurance"). For that reason, Lubin contends that the proposed settlement improperly attempts to settle claims that the attorney general had no authority to bring.

Even assuming that the attorney general may not file class actions based on violations of former articles 21.21-6 and 21.21-8 and former article 21.21, section 3, the attorney general's petition also alleged that all of the conduct described above violated former section 4 as well. In particular, the attorney general contended that Farmers' failure to disclose to its policyholders the conduct listed in the "Causes of Action" section described above generally violated former section 4. In addition, the attorney general stated that the failure to disclose the conduct specifically violated former subsection 4(11), which defines "Misrepresentation of Insurance Policy" as an "unfair and deceptive" act or practice and prohibits insurers from misrepresenting policies by:

> (b) failing to state a material fact that is necessary to make other statements made not misleading, considering the circumstances under which the statements were made; [or]
>
> . . .

57

(e) failing to disclose any matter required by law to be disclosed, including a failure to make disclosure in accordance with another provision of this code.

Former Tex. Ins. Code art. 21.21, § 4(11); *see also* Tex. Bus. & Com. Code Ann. § 17.46(b)(24) (stating that "deceptive acts or practices" includes "failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed"). Moreover, the allegation regarding antitrust laws found in the "common questions" portion of the petition also stated that Farmers' conduct violated former section 4(4), which prohibited an insurer from committing "any act of boycott, coercion[,] or intimidation resulting in or tending to result in unreasonable restraint of, or monopoly in, the business of insurance." *Id.* § 4(4).[39] In light of the language of the governing statutes and the

---

[39] The other actions constituting "unfair methods of competition and unfair and deceptive acts or practices in the business of insurance" under former section 4 can generally be described as follows:

(1) making or using statements in advertisements that misrepresent the terms of an insurance policy, the benefits given under a policy, the financial condition of an insurer, or the type of insurance provided by a policy;

(2) using or making an advertisement containing a statement relating to insurance that is untrue, deceptive, or misleading;

(3) making or using statements that are (i) false or (ii) defame the financial condition of insurer and are designed to injure a person engaged in insurance business;

. . .

(5) filing or making false statements regarding the financial condition of an insurer or entering false information into records for the purpose of deceiving individuals reviewing those records;

58

fact that the attorney general specifically alleged that Farmers' conduct violated former section 4, we cannot conclude that the district court acted arbitrarily or unreasonably when certifying the class. The fact that the alleged conduct might have been violative of provisions in addition to former section 4 would not seem to foreclose the ability of the attorney general to pursue those claims in a class-action form.

In addition, we note that the specific claims that Lubin contends should not have been released under the settlement agreement (claims for Fair Credit Reporting Act violations; discrimination under former article 21.21, section 8; and excessive management fees) all originate from the same course of conduct and transactions that formed the basis of the attorney general's allegations against Farmers and that he asserted violated former section 4. For that reason, Lubin has not asked us to determine whether the attorney general may release claims that have no relationship to claims that the attorney general may pursue through a class action or that he listed as

---

(6) issuing stocks or other benefits to induce the sale of insurance;

(7) charging individuals of the same class and "expectation of life" different rates for life insurance;

(8) inducing the sale of an insurance policy by offering rebate or other advantage or inducing the sale by offering to buy or sell stocks or other securities;

(9) using a name or symbol for an insurance company that is the same or deceptively similar to the name used by another insurance company; and

(10) engaging in unfair settlement practices with regard to claim by insured.

Former Tex. Ins. Code art. 21.21, § 4.

a basis for the suit.[40]  The proposed settlement contemplates a universal settlement of claims originating from Farmers' conduct previously described, and the fairness and adequacy of that settlement will be addressed in a subsequent hearing.  *See McAllen Med. Ctr., Inc.*, 66 S.W.3d at 234.

Finally, although we need not decide the issue here, we note that even if, as alleged by Lubin, the governing statutes did not authorize the attorney general to pursue a class action on all of the claims specified, we would still be unable to find an abuse of discretion here.  The Supreme Court has indicated that class-action settlements may release claims that could not have been pursued had the case been tried, as long as the court had jurisdiction over some of the claims presented.  For example, in *Matsushita Elec. Indus. Co. v. Epstein*, the Supreme Court determined that a class-action settlement in state court that released state claims as well as "claims solely within the jurisdiction of the federal courts" prohibited class members from pursuing the federal claims in federal court.  516 U.S. 367, 375, 387 (1996).  In other words, even though the federal claims could not have been pursued in state court, the release of those claims through the class-action settlement still prevented parties from pursuing those claims in federal court.  Accordingly, the settlement released claims that could not have been otherwise pursued.

For all these reasons, we cannot conclude that the district court abused its discretion in certifying this class action, and therefore, we overrule Lubin's second issue on appeal.

---

[40]  In his testimony, Professor Issacharoff stated that releases originating from the same transactions as the initial complaint are presumptively valid.

## DISCUSSION: THE HOOKSES' CLAIMS

As mentioned previously, there were two groups of policyholders that intervened in this case. In this section, we will address the arguments against certification made by the second group: the Hookses. However, before addressing those claims, it is helpful to provide some background information regarding another class action filed in response to Farmers' conduct.

As detailed earlier, the attorney general originally sued Farmers in August 2002. Later that same month, Geter filed a class action on behalf of all of Farmers' policyholders who were told that their HO-B policies would not be renewed. The Hookses are members of the Geter class action. In that case, Geter essentially contended that Farmers did not have the authority to discontinue all of its HO-B policies because, with a few exceptions, the terms of those policies provided the policyholders with the right to renew their policies if they chose to. *See Farmers Group Inc. v. Geter*, Nos. 09-03-00404-CV, 09-03-00396-CV, 2004 Tex. App. LEXIS 9364, at *26 (Tex. App.—Beaumont Oct. 21, 2004, no pet.) (mem. op.).

In December 2002, the attorney general amended his petition in this case in order to add a class-action component and also filed a proposed class settlement. The proposed settlement defined three subclasses, including the Rate Class. The Rate Class was composed of all of Farmers' policyholders who had been informed that their HO-B policies would not be renewed. For that reason, as mentioned earlier, the Rate Class and the proposed class in the Geter lawsuit were composed of the same policyholders, including the Hookses. Moreover, the proposed settlement in this case released all claims related to Farmers' decision to no longer offer HO-B policies, meaning

that the nonrenewal claims asserted in the Geter class action will likely be extinguished if the settlement is ultimately adopted.[41]

On appeal, the Hookses assert that the district court improperly approved the class definitions contained within the proposed settlement. Furthermore, the Hookses contend that the proposed notice filed as part of the settlement "does not adequately advise class members of the terms and conditions of the class settlement." In addition, the Hookses assert that the attorney general did not have the authority to release the nonrenewal claims made by the Geter class or "to request certification of a settlement class to implement the release of the nonrenewal claims." Finally, in their supplemental brief, the Hookses argue that the district court inadequately analyzed the impact that the proposed settlement would have on the class action filed by Geter. We will address those issues in the order listed.

**Class Definitions**

In their first issue on appeal, the Hookses assert that the Rate Class definition is too broad. *See McAllen Med. Ctr., Inc.*, 66 S.W.3d at 232 (explaining that courts have obligation to protect absent class members from overly broad class definitions). As proof of this assertion, the Hookses state that the purpose of the Rate Class is to compensate individuals who paid HO-A

---

[41] It is worth noting that the district court certified the class in this case and preliminarily approved the settlement shortly before the Geter class action was originally certified in August 2003. In addition, although the Geter class certification was initially reversed on appeal and remanded to the district court, *Farmers Group Inc. v. Geter*, Nos. 09-03-00404-CV, 09-03-00396-CV, 2004 Tex. App. LEXIS 9364, at *29-30 (Tex. App.—Beaumont Oct. 21, 2004, no pet.) (mem. op.), the district court recertified the class on remand, and that certification was upheld on appeal, *Farmers Group Inc. v. Geter*, No. 09-05-00386-CV, 2007 Tex. App. LEXIS 5867, at *16 (Tex. App.—Beaumont July 26, 2007, pet. denied) (mem. op.).

premiums that were too high but that the Rate Class definition also includes individuals who did not purchase HO-A policies from Farmers after being informed that their HO-B policies would not be renewed.[42] Moreover, the Hookses essentially challenge the proposed settlement by asserting that the settlement improperly requires members of the settlement gap described above to release all claims that they may have regarding the decision to no longer provide HO-B policies even though those individuals will receive no compensation for their release. Similarly, the Hookses state that the Discount Class and Credit Usage Notice Class likely include individuals who will receive no compensation under the terms of the settlement but will still be asked to release all of their HO-B related claims.[43]

Previously in this opinion, we determined that Lubin's arguments regarding the release of certain claims were beyond the scope of this appeal. For those same reasons, we believe that the Hookses' arguments regarding the equitability of the release of the HO-B nonrenewal claims are not properly before us and should be reserved for the fairness hearing.[44] *See id.* at 234. Regarding the alleged settlement gap, it is not entirely clear that the presence of an alleged settlement

---

[42] The Hookses estimate that the alleged settlement gap is composed of 100,000 or more former policyholders based on the number of HO-A policies that were sold after Farmers elected to discontinue providing HO-B policies.

[43] As support for this proposition, the Hookses refer to testimony indicating that "a very large portion" of the Discount Class will receive no benefit under the proposed settlement.

[44] Although we do not reach the issue here, we note that the State and Farmers provided extensive briefing regarding why they believed that the nonrenewal claims are without merit and, therefore, properly released. Moreover, both Farmers and the State referred to testimony by the Commissioner indicating that he had extensively researched the nonrenewal issue and that it was his belief that nothing in the governing statutes or the HO-B policies issued by Farmers prohibited it from discontinuing that type of coverage.

gap has any direct bearing on the issues to be decided during the preliminary certification hearing: whether the requirements for certification have been met. In fact, in their briefs, the Hookses acknowledge that alleged settlement gaps are typically addressed during fairness hearings. *See Johnson v. Scott*, 113 S.W.3d 366, 376-77 (Tex. App.—Beaumont 2003, pet. dism'd) (analyzing impact of potential settlement gap during fairness component of settlement class action). Finally, given the limited information in the record regarding the presence of the alleged settlement gap, we are not persuaded that a determination regarding the presence of a settlement gap in this case should be made at this preliminary juncture.

For these reasons, we overrule the Hookses' first issue on appeal.

**Notice**

In their second issue on appeal, the Hookses assert that the notice submitted as part of the proposed settlement does not adequately explain the terms and conditions of the settlement.[45] *See Northrup v. Southwestern Bell Tel. Co.*, 72 S.W.3d 1, 8 (Tex. App.—Corpus Christi 2001, pet. denied) (op. on reh'g) (explaining that in settlement class actions, "adequate notice must be provided

---

[45] We note that it is not entirely clear that the adequacy of the notice is an issue that should be considered at this preliminary stage. *Cf. Northrup v. Southwestern Bell Tel. Co.*, 72 S.W.3d 16, 19-21 (Tex. App.—Corpus Christi 2003, pet. denied) (addressing propriety of notice after trial court had approved proposed settlement). Moreover, it appears from the record that the Hookses did not object to the notice on the grounds alleged on appeal. *See Hall v. Pedernales Elec. Coop., Inc.*, 278 S.W.3d 536, 542 (Tex. App.—Austin 2009, no pet.) (explaining that in class actions, class objector must make objections himself in order to prevent waiver). However, in light of the supreme court's directive to address the "notice" issue, *see Lubin II*, 222 S.W.3d at 427-28, and because we have found no cases prohibiting a court from considering the adequacy of a notice as part of the initial certification of the class, we will address this claim in the interests of justice.

to the class members of all of the material terms of the proposed settlement").[46]  Specifically, the Hookses contend that the notice is insufficient because it does not specify the actual amount of money that the Rate Class will recover and because it does not explicitly state that "many class members will receive no payment of any kind."[47]

Although the Hookses contend that the missing information described above renders the notice ineffective, the Hookses have referred to no cases requiring either type of disclosure, and we have found none.  Moreover, class notices do not have to chronicle every detail in order to be effective, and class members "are not expected to rely upon the notices as a complete source of settlement information."  *Grunin v. International House of Pancakes*, 513 F.2d 114, 122 (8th Cir. 1975); *see Hall v. Pedernales Elec. Coop., Inc.*, 278 S.W.3d 536, 543-44 (Tex. App.—Austin 2009, no pet.) (explaining that notice is generally effective when it prompts class members to investigate

---

[46]  The Hookses also contend that in class actions pursued by the attorney general, it is even more important for a proposed notice to disclose all of the material terms of a proposed settlement because the class members are more likely to believe that the attorney general is acting in their best interests.  However, we have found no authority for the proposition that notices prepared as part of a class action pursued by the attorney general should be subject to higher scrutiny than notices prepared as part of a private class action.

[47]  In their briefs, the Hookses also contend that the class notice is faulty because it does not mention that there are caps to the potential recovery for the Discount Class and the Credit Usage Notice Class and because it does not delineate that the State may recover more than $2 million if the monetary caps are not reached.  However, the terms that the Hookses are referring to were found in the initial proposed settlement and were not incorporated into the amended settlement agreement.  In fact, the amended settlement guarantees 100% recovery for individuals in the Discount Class and the Credit Usage Notice Class and does not authorize the State to recover any compensation as part of the settlement other than the $2 million in fees and expenses discussed earlier.  Moreover, as will be discussed more thoroughly later, the notice does disclose that the State will be receiving the $2 million award.

foundation of action and instructs class members regarding how they may obtain all of information regarding settlement).

The requirements for effective notices issued as part of a class action pursued under the insurance code are listed under former article 21.21, section 18. Former Tex. Ins. Code art. 21.21, § 18(e); *see also* Tex. R. Civ. P. 42(c)(2)(B) (listing similar requirements for notice issued in case in which court determined that predominance element was satisfied). Specifically, former section 18 required that "members of the class" be given "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Former Tex. Ins. Code art. 21.21, § 18(e). In addition, it listed three pieces of information that must be included in the notice:

> (1) the court will exclude the member notified from the class if he so requests by a specified date;
>
> (2) the judgment, whether favorable or not, will include all members who do not request exclusion; and
>
> (3) any member who does not request exclusion, if he desires, may enter an appearance through counsel.

*Id.* § 18(f). The rules of civil procedure provide additional guidance and list the above requirements and state that a notice must contain a description of "the nature of the action," "the definition of the class certified," and "the class claims, issues, or defenses." Tex. R. Civ. P. 42(c)(2). For settlements, the rules also state that the class-action notice must state "the material terms of the proposed settlement." *Id.* R. 42(e)(1)(B).

Under the terms of the proposed settlement, notice will be sent by direct mail to the class members' most recent addresses.[48]  *See Grunin*, 513 F.2d at122 (explaining that delivering notice to last-known address can be most practical way to provide notice to class members).  The notice provides instructions for class members regarding what steps they need to take in order to opt out of the settlement, including the date by which their election must be received, and warns recipients that they will be bound by the settlement if they do not opt out.  *See Northrup v. Southwestern Bell Tel. Co.*, 72 S.W.3d 16, 20 (Tex. App.—Corpus Christi 2002, pet. denied) (noting that effective notice advised class members of opt-out information and deadline and explained that judgment would be binding).  Further, the notice provides information regarding how policyholders who do not opt out of the settlement may still object to the terms of the settlement, and the notice states that objecting class members "may appear, in person or through counsel, to object and be heard . . . at the Settlement Hearing."  *See Mangone v. First USA Bank*, 206 F.R.D. 222, 232 (S.D. Ill. 2001) (noting that effective notice explained how to opt out or object to terms of settlement); *see also Hall*, 278 S.W.3d at 543 (stating that to satisfy due process, notice must apprise class members of pendency of action and explain how to present objections).  The notice also informs the class members that they have the option of seeking "the advice and guidance" of their own attorney if they so desire.  *See Northrup*, 72 S.W.3d at 20 (noting that effective notice stated that members may "enter an appearance through counsel").

---

[48] It is worth noting that under the terms of the proposed settlement, a summary of the notice will be posted on the attorney general's, the Department's, and Farmers' websites.  Professor Issacharoff testified that internet publication was particularly effective in homeowners insurance cases because there is less risk that this type of notification was elected in order to take advantage of people without access to computers.

Further, the notice in this case provides a summary of the allegations that the attorney general made against Farmers and also provides details regarding the parties involved in the dispute. *See id.* at 20 (explaining that effective notice advised members of nature of suit). Also, the notice lists and defines the various subclasses and instructs the recipients that they may be entitled to recovery under one or more of the subclasses.

In addition, the notice also provides information regarding the settlement. *See Mangone*, 206 F.R.D. at 232 (noting that effective notice in settlement class action, among other things, described terms of settlement). Regarding compensation, the notice lists the retrospective and prospective premium-rate reductions. Although no specific recovery values for the Discount Class and Credit Usage Notice Class are given, the notice states that recovery for those subclasses will be determined after the notice is sent out and reveals that the Department will be verifying the recovery before it is sent out. Additionally, the notice specifies that individuals do not have to engage in any action in order to obtain relief as members of the Rate Class and Discount Class provided that the individuals qualify for those subclasses, and the notice informs the recipients how to determine whether they qualify for relief as members of the Credit Usage Notice Class. Moreover, the notice lists the amount of compensation that the State will receive ($2 million) under the proposed settlement and details the manner in which the class members will receive their compensation. *See id.* (concluding that notice in settlement class action was adequate in part because it provided information regarding fees and explained how funds will be distributed). Further, the notice lists the parties and claims that will be released under the settlement, including the release of all claims relating to the decision to no longer offer HO-B policies. *See Daccach*, 217 S.W.3d at 458

68

(explaining that effective notice should inform class members of preclusive effect that class action may have on individual claims).

Importantly, the notice states when and where the settlement hearing will be held, lists contact information in case any of the recipients have questions regarding the notice, and provides instructions for obtaining copies of the proposed settlement and for viewing the complete settlement on the Department's website. *See Hall*, 278 S.W.3d at 544 (noting, when determining that notice in settlement class action was adequate, that notice provided contact information and listed website where settlement terms could be viewed); *see also Mangone*, 206 F.R.D. at 232-33 (explaining that effective notice indicated time and place of settlement hearing and listed contact information for class members to make inquiries about settlement).

For all these reasons, we cannot conclude that the district court abused its discretion by approving the proposed notice, and therefore, we overrule the Hookses' second issue on appeal.

**Authority of Attorney General**

In their third issue, the Hookses assert that former section 17 of article 21.21 does not authorize the attorney general to release the claims pursued in the Geter class action as part of a settlement. Specifically, the Hookses contend that former section 17 only allows the attorney general to pursue class actions based on unlawful methods, acts, or practices defined in former section 4. *See* former Tex. Ins. Code art. 21.21, §§ 4, 17. In light of the fact that the failure to renew policies is not listed as a prohibited act in former section 4, the Hookses contend that the release of the nonrenewal claims as part of the proposed settlement was improper because the attorney general may

69

not pursue that claim[49] and because the claims forming the basis for this class action (excessive premium rates and discriminatory practices) are legally distinct from the contract claims pursued by the Geter class.

Lubin raised similar concerns in her briefs, although her assertions focused on the claims forming the basis for the class action rather than a claim that was released but not specifically pursued or pleaded as part of the class action. When addressing Lubin's assertions, we noted that the claims that she argued should not have been released all stemmed from the same course of conduct engaged in by Farmers. Similarly, the nonrenewal claims that the Hookses contend were inappropriately released originate from one of the foundations underpinning this lawsuit: Farmers' decision to begin selling HO-A policies. Regarding Lubin's complaints, we also noted that the Supreme Court has indicated that class actions resting on permissible claims may also release causes of action that otherwise could not have been pursued. *See Epstein*, 516 U.S. at 375, 387.

For these same reasons, even assuming that the attorney general may only pursue claims based on alleged violations of former section 4, we cannot conclude that the district court abused its discretion by preliminarily approving a proposed settlement that released the nonrenewal claims, which arguably could not have served as a basis for a class action on their own. Moreover, as with many of the other issues raised, this argument relates to the fairness of releasing certain claims, which is an issue not before us. *See McAllen Med. Ctr., Inc.*, 66 S.W.3d at 234.

---

[49] As support for this assertion, the Hookses refer to testimony by the Commissioner stating that after performing an investigation, he concluded that Farmers' decision to stop offering HO-B policies did not violate any insurance code provisions. Further, the Hookses point to the portion of Casari's testimony in which she stated that the Department did not have the regulatory authority to prevent Farmers from discontinuing its HO-B policies.

70

Alternatively, the Hookses contend that the settlement is improper because it exceeded the scope of the matters referred to the attorney general by the Commissioner. In other words, the Hookses insist that because settlement class actions require heightened scrutiny, *see id.* at 232, proposed settlement class actions pursued under the former insurance code provisions must be limited to the matters specifically referred to the attorney general by the Commissioner. Because the letter sent by the Commissioner requesting the attorney general to file this class action did not mention nonrenewal claims and because none of the common questions listed in the attorney general's amended petition address nonrenewal claims, the Hookses contend that the proposed settlement exceeds the scope of the authorized class action by releasing claims that the attorney general was not authorized to pursue.[50]

It is true that heightened scrutiny is used when reviewing settlement class actions in order to protect absent class members. *Id.* at 232. That heightened scrutiny is applied to a determination of whether the necessary statutory class-action requirements (e.g., typicality, adequacy, and predominance) have been satisfied, and we can see no reason to conclude that the level of

---

[50] In their reply brief, the Hookses complain that this class action is improper because by agreeing to release the nonrenewal claims, the attorney general has taken a position hostile to the interests of the members of the Geter class, who are the same individuals making up the Rate Class in this case. In addition, the Hookses argue that the release is improper due to the merits of their nonrenewal claims. Previously we determined that arguments regarding the decision to release certain claims through the proposed settlement and the merits of those claims went to the fairness of the proposed settlement, which is an issue we are not confronted with in this appeal. For the reasons previously discussed, we also believe that the Hookses' arguments regarding the merits of the nonrenewal claims and their release are beyond the scope of this appeal. *See McAllen Med. Ctr., Inc.*, 66 S.W.3d at 234. Moreover, although we do not reach the issue here, we note that the proposed settlement in this case provides some type of recovery to most of the Geter class members through prospective and retrospective reductions to HO-A premiums and possibly through the additional recovery provided to the Discount Class and the Credit Notice Usage Class.

scrutiny applied to certification prerequisites has any limiting effect on or applicability to a request by the Commissioner asking the attorney general to file a class action. Moreover, the language of former section 17 does not impose a requirement that the Commissioner or the Department set out the entire scope of a class action before the attorney general may initiate the class action. In fact, other than requiring that a request be submitted to the attorney general, former section 17 imposes no direct obligation on the Commissioner or the Department as a prerequisite to filing a class action. In addition, we note that the reasons discussed previously that serve as support for a decision to certify a class that sought to release claims not specifically identified in former section 4 would also seem to apply to a decision to approve a class action that sought to release claims not specifically identified in the Commissioner's request. In other words, the enumeration of specific causes of action in a letter by the Commissioner would not seem to foreclose the possibility that other claims may be released through the settlement process. In light of the preceding, we cannot conclude that the district court abused its discretion by certifying a settlement class action that sought, among other things, to release certain claims that were not specifically identified by the Commissioner prior to the class action being filed.

For these reasons, we overrule the Hookses' third issue on appeal.

**Impact on the Geter Class**

In their final issue, the Hookses contend that the district court failed to adequately consider the fact that the proposed settlement would effectively extinguish all of the renewal claims forming the basis for the Geter class action. In making this assertion, the Hookses refer to testimony indicating that the attorney general had no knowledge of the Geter class action at the time when the

72

proposed settlement was submitted for preliminary approval and stating that the proposed settlement provided no compensation for the release of the nonrenewal claims pursued by the Geter class.[51] Further, the Hookses state that they filed their plea in intervention less than a week before the hearing because they only found out about the certification hearing shortly before the hearing.[52] Moreover, they assert that their plea was filed after the time allotments had been decided and consequently were given little time to argue their case or to present evidence and were not allowed to make closing arguments. In particular, the Hookses claim that they were not given an opportunity to ask the attorney general's witnesses about the decision to release the nonrenewal and other claims through the settlement. For all these reasons, the Hookses contend that the district court could not and did not fully consider the impact that settling this class action will have on the Geter class action.

As a preliminary matter, we note that the district court expressed its confusion regarding why the Hookses delayed becoming involved in this case until right before the certification hearing, particularly in light of the fact that the proposed class action in this case had "been publicized throughout the [S]tate." Further, although it appears from the record that the Hookses' notice of intervention was filed shortly before the certification hearing and that the Hookses had a relatively minor role during the certification hearing, our review of the record has failed to identify a specific objection made by the Hookses regarding the fairness of the certification hearing. *Cf. Hall*,

---

[51] The testimony referred to revealed that the objective of the settlement was to provide restitution for individuals who had paid excess premiums, had been the victim of discriminatory practices, or had not received notice that their premiums were increased due to their credit histories.

[52] The Hookses further contend that although Farmers was a party to the Geter class action and, therefore, knew of its existence, no party informed the Hookses about the certification proceeding occurring in this case.

278 S.W.3d at 542 (explaining that failure to make specific objection waives complaint). In fact, at the end of the hearing, the district court asked whether "everyone has now offered all the evidence they intend to offer," and the Hookses answered affirmatively.

Regardless, although the record reveals that the Hookses were not allotted a great deal of time in the hearing, the Hookses accepted the amount that they were given and stated that they would use their "time most judiciously, as little as humanely possible." Furthermore, the Hookses actively participated in the hearing, gave an opening statement, cross-examined witnesses, and presented evidence. Although the Hookses did not provide a closing statement, a joint closing statement on behalf of all of the Policyholders was given. In addition, the Hookses' motion to intervene summarized the basis for their nonrenewal claims and detailed the relief that they sought from the district court.

Moreover, given that the focus of the preliminary hearing in this case mostly concerned whether the requirements for certification had been met, the Hookses' complaint that they were unable to introduce enough evidence or testimony regarding the impact of the settlement on the nonrenewal claims in the Geter class action goes to the fairness of the settlement, which will be addressed in a subsequent hearing and which is not properly before us. *See McAllen Med. Ctr., Inc.*, 66 S.W.3d at 234.

For these reasons, we overrule the Hookses' final issue on appeal.

**CONCLUSION**

Having overruled all of the Policyholders' issues on appeal, we affirm the district court's certification order.

74

_____

David Puryear, Justice

Before Chief Justice Jones and Justices Puryear and Henson

Affirmed on Remand

Filed:   November 6, 2009